UNITED FOOD AND COMMERCIAL WORKERS
UNION, LOCAL 919, AFL-CIO *v.*
CRYSTAL MALL ASSOCIATES,
L.P., ET AL.
(SC 16956)

Sullivan, C. J., and Borden, Katz, Palmer and Vertefeuille, Js.

Argued March 23—officially released July 27, 2004

*J. William Gagne, Jr.*, with whom was *P. Jo Anne Burgh*, for the appellant (plaintiff).

*Charles D. Ray*, with whom, on the brief, were *William H. Narwold* and *Ingrid L. Moll*, for the appellees (named defendant et al.).

*Martin B. Margulies*, *Erin Boggs* and *Philip D. Tegeler* filed a brief for the Connecticut Civil Liberties Union Foundation as amicus curiae.

*Thomas W. DeMille* and *Edward J. Sack*, pro hac vice, filed a brief for the International Council of Shopping Centers, Inc., as amicus curiae.

*Opinion*

KATZ, J. The plaintiff, United Food and Commercial Workers Union, Local 919, AFL-CIO, appeals[1] from the

___

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court. On January 28, 2003, the parties, pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2, requested that the appeal be transferred to this court. On March 18, 2003, we granted the joint motion to transfer the appeal.

judgment of the trial court denying its request for injunctive relief. The plaintiff sought to enjoin the defendants, Crystal Mall Associates, L.P., and its management company (defendant),[2] from prohibiting its entry into the common areas of the Crystal Mall (mall), a privately owned shopping mall located in the town of Waterford, for the purpose of distributing literature and speaking to patrons concerning the issue of employees' rights. The plaintiff claims that the defendant violated its right to freedom of speech under article first, §§ 4[3] and 5,[4] of the constitution of Connecticut and its right to freedom of assembly under article first, § 14,[5] of the constitution of Connecticut. Relying on this court's decision in *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 469 A.2d 1201 (1984), which concluded that our state constitution imposes a state action requirement in order to trigger the protection of free speech and assembly rights, the trial court, *Quinn, J.*, determined that the defendant was a private actor, and therefore, not sub-

---

[2] At the time of the incident giving rise to this action, Crystal Mall Associates, L.P., owned and controlled the mall, whereas Crystal Mall Development and Management Company, Inc., operated, managed, controlled and maintained the mall. Both entities were named as defendants in this case. On December 31, 1997, Crystal Mall Development and Management Company, Inc., was dissolved, and responsibility for the management and operation of the mall shifted to Simon Property Group, L.P. On February 11, 2002, the plaintiff moved that Simon Property Group, L.P., be made a party defendant. That motion was granted on March 11, 2002. For the purpose of clarity, and because Crystal Mall Associates, L.P., and Simon Property Group, L.P., are represented by the same counsel and did not submit separate briefs to this court, we refer to the defendants throughout this opinion in the singular form.

[3] Article first, § 4, of the constitution of Connecticut provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

[4] Article first, § 5, of the constitution of Connecticut provides in relevant part: "No law shall ever be passed to curtail or restrain the liberty of speech . . . ."

[5] Article first, § 14, of the constitution of Connecticut provides: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."

ject to the guarantees afforded by the state constitution. Accordingly, the trial court denied the injunction. Urging us to adopt a fact-specific, flexible approach, the plaintiff contends that our constitutional jurisprudence since *Cologne* dictates that we now interpret our freedom of expression provisions as providing a less stringent view toward the state action requirement. The plaintiff also points us to those jurisdictions that have interpreted their free speech provisions as conferring broader protection than the federal constitution. We conclude, however, that, even if we were to accept the plaintiff's invitation to interpret our state constitution as providing for a more expansive interpretation of state action, the facts in the present case still would not permit the plaintiff to prevail. We therefore conclude that, in the present case, there is inadequate state action to trigger state constitutional protection, and, accordingly, we affirm the judgment of the trial court.

The record and a joint stipulation the parties submitted to the trial court reveal the following facts and procedural history. The dispute between the parties began on July 7, 1997, when the plaintiff filed a complaint arising from the defendant's request that the plaintiff leave the Crystal Mall Hometown Fair (Hometown Fair),[6] an event held on March 1, 1997. After a complaint by Filene's, one of the mall's tenant stores, mall staff had asked the members of the plaintiff union to leave the fair, and they had done so in a peaceful

---

[6] Testimony provided to the trial court, *Stengel, J.*, established that the plaintiff initially had responded to an advertisement for the Hometown Fair, which provided in part: "At Crystal Mall we have set aside Saturday, March 1, from 9:30 am–6 pm for our Hometown Fair. [It is] a day to take pride in our community with neighbors and experience the activities available in our own backyard. Your civic group or non-profit organization can sell crafts, baked goods, sign up new members, or simply distribute information right inside Crystal Mall at your designated location!"

manner.[7] Thereafter, the plaintiff sought a temporary injunction prohibiting the defendant from denying it access to and participation in any future fairs or similar events and from creating and enforcing any policy that would have the effect of denying the plaintiff access to such events. The plaintiff also sought an award of damages and costs, including attorney's fees, based on the defendant's violation of the plaintiff's state constitutional rights to free speech and assembly. On October 8, 1997, after a hearing on the matter, the trial court, *Stengel, J.*, denied the application for temporary injunctive relief, stating that, on the basis of this court's decision in *Cologne* v. *Westfarms Associates*, supra, 192 Conn. 48, the plaintiff was not likely to succeed on the constitutional issues raised, that the plaintiff had not sustained its burden of proof that there was irreparable harm and that the plaintiff had not presented evidence that the defendant had planned to hold future fairs.

Thereafter, on December 28, 2001, the plaintiff wrote to the defendant that some of its members intended to enter the mall on January 9, 2002, " 'to distribute literature and talk with people in the mall concerning employee rights under the state and federal laws.' " In this letter, the plaintiff represented that its members would " 'be peaceful and limit their activity to the common areas of the mall and not the tenant stores.' " Additionally, the plaintiff asserted that the distribution of information was " 'not an organizational effort.' " By letter dated January 2, 2002, the defendant denied the plaintiff permission to enter the mall for the plaintiff's stated purposes.[8]

---

[7] At the time the plaintiff was asked to leave, mall staff told the plaintiff that its presence was not in accordance with the purpose of the Hometown Fair as advertised and expressed their opinion that the plaintiff had not provided accurate or complete information on the "exhibitor entry form" submitted to the defendant.

[8] On February 11, 2002, the plaintiff filed a request to amend its complaint to reflect the defendant's written refusal to allow the plaintiff's members access to the mall.

Thereafter, in an amended complaint filed on March 28, 2002, the plaintiff sought this permanent injunction to enjoin the defendant from denying access to the mall, in violation of the plaintiff's state constitutional rights to freedom of speech and assembly, as well as from creating or enforcing any policy that would have such an effect. In addition, the plaintiff sought costs, attorney's fees and such other relief as the "court may deem necessary and proper." On August 15, 2002, the trial court, *Quinn, J.,* relying on this court's decision in *Cologne,* denied the injunction. Specifically, the trial court concluded that the state constitutional rights to freedom of speech and assembly may not be exercised against a private property owner's wishes when that property consists of a large regional shopping center. In addition, the court disagreed with the plaintiff's contention that this matter is factually distinguishable from *Cologne* because, in the present case, both the state and the town of Waterford had been involved directly in the construction of the mall. This appeal followed.[9] Additional facts will be set forth as necessary.

On appeal, the plaintiff asks us to recognize that the Connecticut constitution requires a lesser showing of state action in order to trigger protection of the rights to free speech and assembly than does the constitution of the United States. In so doing, the plaintiff urges us to adopt a fact-specific, flexible analysis in order to determine whether such a state action requirement has been met. The plaintiff urges us to then conclude that the defendant in the present case is a state actor that has violated the plaintiff's state constitutional rights to free speech and assembly.[10] In response, the defendant

[9] On May 7, 2003, we granted the motion of the Connecticut Civil Liberties Union Foundation to file an amicus curiae brief on this issue. On October 28, 2003, we granted the motion of the International Council of Shopping Centers, Inc., to file an amicus curiae brief on this issue.

[10] The plaintiff claims that, because the facts support a determination that the defendant is a state actor, the next inquiry is whether the plaintiff's speech was compatible with the operation of the mall pursuant to our

contends that the present case is controlled by our decision in *Cologne* v. *Westfarms Associates*, supra, 192 Conn. 63. The defendant further contends that, even under a more expansive definition of state action as suggested by the plaintiff, the evidence in the present case still does not establish state action. We agree with the defendant that, even using a lenient standard of state action, the defendant in the present case cannot be deemed a state actor.

I

The following additional facts are important to the disposition of this case. On July 9, 1979, an application was submitted to the Waterford planning and zoning commission seeking permission to construct the mall. The application stated that it was anticipated that "Crystal Mall, with all its amenities, probable connection to public transportation, its interior community spaces, and the comfortable controlled protection from the elements which the mall itself affords, will become the central focus of Waterford." The application represented that the mall would encompass a large trade area that would include numerous towns, both in Connecticut and Rhode Island, and five military installations. According to the application, "[m]any people will find themselves spending greatly extended periods of time within the complex of stores, malls and department stores." The application also stated that the mall would employ approximately 2000 to 2500 employees and even more during the holiday season. In addition, the application stated that "great benefits could be realized if the regional transit system . . . would incorpo-

standard enunciated in *State* v. *Linares*, 232 Conn. 345, 378, 655 A.2d 737 (1995) (relevant inquiry is "whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time" [internal quotation marks omitted]). Because we disagree with the plaintiff's argument that the defendant's actions can be deemed state action, we need not address this claim.

rate [the mall] into its transportation network" and that "the combined traffic activity on Route 85 resulting from the site generated volumes and local area traffic cannot be accommodated on the existing roadway." In order to accommodate the traffic issues, the application proposed reconstructing Route 85, by adding additional lanes, exit and entrance ramps, and traffic signals.

The construction of the mall required an extensive permit and approval process. On June 26, 1979, the Waterford conservation commission approved the application regarding construction of the mall, but with certain conditions, including the filing of a $75,000 performance bond. In a letter dated August 10, 1979, the state department of environmental protection addressed various environmental concerns, stated that it wanted to perform a field inspection of the area and informed the mall's developers that permits would be required for the discharge of sanitary wastewater and stormwater.

The southeastern Connecticut regional planning agency informed the Waterford town planner that, based on its review of the developer's application for the mall, in order to accommodate the new traffic that would be created by the mall, several specific changes should be made to the mall's surrounding roads and highways, including Route 85 and Interstate 95. On October 24, 1979, the state traffic commission issued a certificate that would become valid when the mall's developers completed several conditions, some of which had been suggested by the southeastern Connecticut regional planning agency, including: "(a) widening Route 85 to four lanes, with additional turn lanes and a raised median; (b) the installation of signal lights on Route 85 at the [Interstate 95] southbound ramps and certain driveways; (c) the modification of an existing signal at Dayton Place; (d) the construction of an operational lane on [Interstate 95] . . . to facilitate accelera-

tion, deceleration and merging movements; and (e) reconstruction of the [Interstate 95] off-ramp." (Internal quotation marks omitted.) The state traffic commission also imposed certain requirements for the roadways within the mall complex.

The developer's planning and zoning application requested several modifications of existing regulations, including a reduction in the size of parking spaces, an increase in building height and any aerials or antennas attached thereto, variations on landscaping and the removal of certain construction restrictions. On November 26, 1979, the planning and zoning commission approved the developer's application for the mall subject to certain conditions. The approval included restriction on building sizes, landscaping, the placement of traffic islands and pedestrian walkways, and several off-site traffic improvements of the type already described in this opinion.

In an interim report, commenting on the impact that the construction of the mall would have on the town of Waterford's fire services, the chairman of the Waterford board of fire commissioners stated that the impact would be "extensive" and would require "substantial increases" in the fire commission's budget. The chairman further stated that additional staff and equipment, including a new $250,000 aerial ladder truck, would be required. On May 10, 1984, the fire marshal communicated to the town planner, by letter, regarding certain safety conditions that were required to be in place in time for the proposed early opening of three of the mall's anchor stores.[11] In addition, the mall was required to install radio receivers compatible with fire company transmitters.

Murray J. Pendleton, a sergeant in the support services division of the Waterford police department,

---

[11] The town planner approved a request to open the mall in phases rather than on one specific date, subject to certain conditions.

reported to the town planner that traffic control signals needed to be in place and operational before the opening of the mall and that emergency parking spaces should be established near major entrances of the mall to be used by fire and police officers. On July 19, 1984, the Waterford deputy chief of police and Pendleton conducted an inspection of the mall. Pendleton reported to the planning and zoning commission that there were a number of problems that needed to be corrected.

The application to the planning and zoning commission indicated that the Waterford chief of police believed that the mall "would necessitate an increase in the [d]etective [d]ivision [staff] due to the resultant increase of bad checks, shoplifting, larceny, and burglaries . . . [and] that there would be an increase in motor vehicle accidents, due to the larger volumes of traffic."

On October 22, 1984, the planning and zoning commission met and voted to extend the mall's temporary certificate of zoning compliance and to require one of the mall's anchor stores to provide a $10,000 forfeiture bond to cover certain work that had not been completed. At this same meeting, the fire marshal reported that the replacement of the main fire panel needed to be completed in one of the anchor stores and that a final inspection had to be made by the fire marshal, the zoning enforcement officer, the town planner and the police department before that store's opening. In addition, the planning and zoning commission approved the defendant's request to amend a zoning regulation that concerned the sale of alcoholic beverages, in order to exempt liquor sales outlets from the distance requirement when they are located in an approved regional shopping center such as the mall. A few days later, on October 24, 1984, the planning and zoning commission wrote a letter detailing a number of items that needed

to be completed prior to the expiration of the temporary certificates of zoning compliance issued for the mall and its anchor stores. On January 21, 1985, subject to the condition that the mall submit a $30,000 bond to cover the cost of some remaining landscaping and the removal of a house that had served as an office during the mall construction process, the planning and zoning commission voted in favor of the mall's request for a final certificate of occupancy.

Since the mall opened, there has been further state and municipal agency "involvement" with the mall. For example, the town planner notified mall management that the permit issued by the conservation commission required that a contact person be designated to whom the commission could address problems. Also, at the police department's request, the mall was to contain a room or office to be used for detention purposes and first aid practices. Since July 19, 2001, police officers have had access to a room at the mall for "writing reports affiliated with activity at the mall, such as shoplifting, juvenile referral or locating a lost child or car and for interviewing people or suspects." The police chief has directed the assignment of police officers to the mall "as often as schedules and manpower and other departmental responsibilities allowed."[12] The mall is located in the "north patrol" zone of Waterford. Therefore, a police officer "could be assigned [from the mall] to other incidents with[in] the [n]orth [p]atrol, as required." During the holiday period, which begins the day after Thanksgiving and runs through the day after New Year's Day, the police chief assigns an officer on a "time and one-half" basis for the purpose of devoting extra patrol to the mall and other area stores.

Currently, the mall is an enclosed shopping center that includes four anchor stores as well as 130 specialty

---

[12] According to the parties' stipulation, a police officer was assigned to the mall approximately 75 percent of the time, between noon and closing.

stores, a food court, and common areas consisting of walkways, concourses and several seating areas. The common areas are open to the general public free of charge, but mall management reserves the right to preclude persons "if their presence is deemed by management to be incompatible with the business purposes of the [m]all." In the past, particular civic organizations have been allowed access to the mall's common areas, but management has reserved the right to exclude any group that, "in management's opinion, may be detrimental" to "enhanc[ing] the goodwill . . . [and] business mission of the [m]all." Various groups and organizations previously have been granted access to the mall's common areas, including: American Business Women's Association, Niantic Bay Chapter; American Red Cross; Eastern Connecticut Chapter #196, Military Order of the Purple Heart; Griswold Friends of Music; Independent Beauty Consultants; Oak Grove Montessori School; Sierra Club of Southeastern Connecticut; and WCNI Radio.

## II

As a threshold matter, we address our standard of review. The issue of whether the conduct of a private actor constitutes state action is a question of law. See *State* v. *Lasaga*, 269 Conn. 454, 463–64, 848 A.2d 1149 (2004). Consequently, our review of the trial court's determination of that issue is plenary. Id., 463.

Our analysis begins with a brief review of this court's decision in *Cologne* v. *Westfarms Associates*, supra, 192 Conn. 48. In *Cologne*, the plaintiffs, the Connecticut National Organization for Women and one of its members, sought permission to solicit shoppers at the Westfarms Mall, which is located partly in the town of Farmington and partly in the town of West Hartford, to sign petitions in support of the proposed equal rights amendment to the federal constitution. Id., 51. As in the present

case, the Westfarms Mall permitted various activities on its premises, including informational programs and various exhibitions and other events. Id. In addition, the Westfarms Mall was served by several major traffic arteries, and public transportation to the mall regularly was provided. Id. The plaintiffs in *Cologne* contended, first, that our state constitutional provisions, unlike their federal counterparts, express affirmative rights to free speech and assembly not reliant solely upon government interference. See id., 62–63. Therefore, the plaintiffs requested that this court engage in a balancing test between the plaintiffs' rights and the interest of the defendant mall owners in controlling and operating their private property. Id., 64. In the alternative, the plaintiffs argued that the Westfarms Mall was a state actor, because it "ha[d] assumed a uniquely public character by virtue of its great economic, social and cultural impact upon the community." Id., 64. After reviewing the language and history of our state constitutional provisions guaranteeing freedom of expression from governmental regulation, this court concluded that those provisions were "designed as a safeguard against acts of the state and do not limit the private conduct of individuals or persons." (Internal quotation marks omitted.) Id., 63. The court further concluded that the public use of a private shopping mall did not transform the mall owners' refusal to allow political speech within the mall into state action. Id., 64–66; see *Sheff* v. *O'Neill*, 238 Conn. 1, 20, 678 A.2d 1267 (1996).

It is well settled that there is no right under the first amendment to the United States constitution for a person to use a privately owned shopping center as a forum to communicate without the permission of the property owner. *Lloyd Corp., Ltd.* v. *Tanner*, 407 U.S. 551, 569, 92 S. Ct. 2219, 33 L. Ed. 2d 131 (1972). A state, however, may adopt greater protection for free expression on private property, so long as such protection does not

conflict with any federally protected property right of the owners of private shopping centers. See *Pruneyard Shopping Center* v. *Robins*, 447 U.S. 74, 81, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980) ("[o]ur reasoning in *Lloyd [Corp., Ltd.]*, however, does not . . . limit the authority of the [s]tate to exercise its police power or its sovereign right to adopt in its own [c]onstitution individual liberties more expansive than those conferred by the [f]ederal [c]onstitution"). As this court noted in *Cologne*, the "invitation to state courts to construe state constitutional guarant[ees] to enhance freedom of expression above the minimum federal constitutional level in the context of access to shopping centers for political propagandizing efforts has occasioned some remarkably close divisions of opinion among the judges who have considered the matter. *Robins* v. *Pruneyard Shopping Center*, 23 Cal. 3d 899, 592 P.2d 341, 153 Cal. Rptr. 854 (1979) [four to three decision]; *Batchelder* v. *Allied Stores International, Inc.*, 388 Mass. 83, 445 N.E.2d 590 (1983) [same]; *Woodland* v. *Michigan Citizens Lobby*, 128 Mich. App. 649, 341 N.W.2d 174 (1983) [two to one decision] [aff'd, 423 Mich. 188, 378 N.W.2d 337 (1985) (en banc)] . . . ." (Citations omitted.) *Cologne* v. *Westfarms Associates*, supra, 192 Conn. 58. The decision in *Cologne* was also made by a divided court. See id., 66.

Since the decision in *Cologne*, courts in other jurisdictions that have considered this issue overwhelmingly have chosen *not* to interpret their state constitutions as requiring private property owners, such as those who own large shopping malls, to permit certain types of speech, even political speech, on their premises. See *Citizens for Ethical Government, Inc.* v. *Gwinnett Place Associates, L.P.*, 260 Ga. 245, 245–46, 392 S.E.2d 8 (1990) (recognizing that shopping malls "represent a fertile potential source of signatures," but stating that such convenient access to large number of shoppers

"does not create a constitutional right of access to private property for political activity"); *People* v. *DiGuida*, 152 Ill. 2d 104, 129, 604 N.E.2d 336 (1992) (concluding that freestanding grocery store was not public or quasi-public entity and therefore defendant's speech not protected); *West Des Moines* v. *Engler*, 641 N.W.2d 803, 806 (Iowa 2002) (stating that, even if malls have supplanted public streets as suitable places to gain access to people, that fact "does not convert privately owned and operated business locations into public places"); *Woodland* v. *Michigan Citizens Lobby*, supra, 423 Mich. 212 (holding that Michigan's constitution is "a shield against the actions of the state," not "a sword by individuals against individuals," and rejecting argument that large shopping centers should be exempt from state action requirement); *State* v. *Wicklund*, 589 N.W.2d 793, 794, 802 (Minn. 1999) (noting lack of evidence that largest shopping center in United States enjoyed "power, property and prestige" of state or city even though significant public financing was used to develop mall, state and local government regulations governed construction of mall, mall made space available in basement for police, and mall leased space to two public entities—post office and alternative school); *SHAD Alliance* v. *Smith Haven Mall*, 66 N.Y.2d 496, 506, 488 N.E.2d 1211, 1213, 498 N.Y.S.2d 99 (1985) ("To be sure, the shopping mall has taken on many of the attributes and functions of a public forum, as the record demonstrates, but the characterization or the use of property is immaterial to the issue of whether [s]tate action has been shown. Nor can the nature of property transform a private actor into a public one . . . ." [Citations omitted.]); *State* v. *Felmet*, 302 N.C. 173, 178, 273 S.E.2d 708 (1981) (declining to protect defendant's actions of soliciting signatures for petition against draft in mall parking lot under state constitution's freedom of expression provision); *Eastwood Mall, Inc.* v. *Slanco*, 68 Ohio St. 3d 221, 223,

626 N.E.2d 59 (holding that protection afforded by free speech provision of Ohio constitution is no broader than that of first amendment to federal constitution in cases involving privately owned shopping centers), cert. denied, 513 U.S. 933, 115 S. Ct. 329, 130 L. Ed. 2d 288 (1994); *Stranahan* v. *Fred Meyer, Inc.*, 331 Or. 38, 65–66, 11 P.3d 228 (2000) (overruling *Lloyd Corp.* v. *Whiffen*, 315 Or. 500, 849 P.2d 446 [1993], which had granted public access to large shopping mall over private property owner's objection for purpose of soliciting signatures on initiative petitions); *Western Pennsylvania Socialist Workers 1982 Campaign* v. *Connecticut General Life Ins. Co.*, 512 Pa. 23, 37, 515 A.2d 1331 (1986) (holding that, although Pennsylvania constitution provides more expansive protection of free speech than federal constitution, it does not confer right to solicit signatures for gubernatorial candidate's nominating petition in privately owned shopping mall); *Charleston Joint Venture* v. *McPherson*, 308 S.C. 145, 150–51, 417 S.E.2d 544 (1992) (rejecting argument that shopping mall was functional equivalent of public forum); *Southcenter Joint Venture* v. *National Democratic Policy Committee*, 113 Wash. 2d 413, 425–26, 780 P.2d 1282 (1989) (declining invitation to drop state action requirement in favor of "balancing test," under which court would weigh free speech interests against private property interests of mall owner);[13] *Jacobs* v. *Major*, 139

[13] In *Alderwood Associates* v. *Washington Environmental Council*, 96 Wash. 2d 230, 232, 635 P.2d 108 (1981), the Washington Supreme Court reversed an injunction that had been issued prohibiting signature collection for a political initiative at a shopping mall. In that decision, a plurality of the court held that the state constitution's free speech clause did *not* require state action. Id., 243. In *Southcenter Joint Venture* v. *National Democratic Policy Committee*, supra, 113 Wash. 2d 427–29, the court rejected the position of the plurality in *Alderwood Associates* and instead held that shopping malls must provide access for political activity under the state's free speech clause *only if* state action is present. Currently, the narrow holding in *Alderwood Associates* that Washington's constitutional initiative provision protects petitioners seeking to collect signatures in a shopping mall is still valid.

Wis. 2d 492, 524, 407 N.W.2d 832 (1987) (finding no state action and noting that "[i]t is clear that malls . . . [cannot] be said to have an essentially public function. Malls, shopping centers, department stores, and specialty stores exist for primarily one function: profit for their owners. The public nature of their business is a byproduct . . . ."); see also *Fiesta Mall Venture* v. *Mecham Recall Committee*, 159 Ariz. 371, 375–76, 767 P.2d 719 (App. 1998) (Arizona Court of Appeals recognizing that, while Arizona's constitutional free speech provision "may be more extensive" than first amendment to federal constitution, defendant failed to establish that state's provision "restrain[s] private conduct"; also rejecting argument that large shopping centers are functional equivalents of public forums).[14]

In contrast, only five states—California, Colorado, Massachusetts, New Jersey and Washington—currently hold that a state may require private shopping mall owners to permit some form of political activity in common areas of the mall.[15] As we noted in *Cologne*, "[b]oth the California and Washington decisions rely in part upon the highly significant role which initiative, referendum and recall sponsored directly by the citizenry have played in the constitutional schemes of those states, and the practical importance of access to large congre-

[14] We note that, almost without exception, these courts, which all have interpreted their state constitutions as allowing private property owners, such as those who own large shopping malls, to regulate speech on their premises, cite with approval this court's decision in *Cologne*.

[15] See *Robins* v. *Pruneyard Shopping Center*, supra, 23 Cal. 3d 899; *Bock* v. *Westminster Mall Co.*, 819 P.2d 55 (Colo. 1991); *Batchelder* v. *Allied Stores International, Inc.*, supra, 388 Mass. 83; *New Jersey Coalition Against War in the Middle East* v. *J.M.B. Realty Corp.*, 138 N.J. 326, 650 A.2d 757 (1994), cert. denied sub nom. *Short Hill Associates* v. *New Jersey Coalition Against War in the Middle East*, 516 U.S. 812, 116 S. Ct. 62, 133 L. Ed. 2d 25 (1995); *Alderwood Associates* v. *Washington Environmental Council*, 96 Wash. 2d 230, 635 P.2d 108 (1981); see also *Jamestown* v. *Beneda*, 477 N.W.2d 830, 835 (N.D. 1991) (finding state action when *city* owned mall, but leased it to private developer).

gations of voters in order to obtain signatures on petitions used to implement those rights. [See *Robins* v. *Pruneyard Shopping Center*, supra, 23 Cal. 3d 907–908; *Alderwood Associates* v. *Washington Environmental Council*, 96 Wash. 2d 230, 240, 635 P.2d 108 (1981).] [16] The Massachusetts decision was expressly limited to the solicitation of signatures needed by political candidates for access to the ballot and relied, not upon its freedom of speech provision, but upon a state constitutional guarant[ee] of an equal right to elect officers and to be elected, for public employments. [See *Batchelder* v. *Allied Stores International, Inc.*, supra, 388 Mass. 91–93.]" (Internal quotation marks omitted.) *Cologne* v. *Westfarms Associates*, supra, 192 Conn. 58–59.

In *Bock* v. *Westminster Mall Co.*, 819 P.2d 55, 56 (Colo. 1991), the Colorado Supreme Court held that its state constitution protected political leafletting in a large shopping mall. In so concluding, the court viewed the mall, which enjoyed a "prominent location in the City [of Westminster (city)] across the street from the City Hall" as being so entangled with the government that there was sufficient state action to trigger the protection of Colorado's constitutional free speech provision.[17] Id., 57. Specifically, the court explained that "[w]here governmental entities or public monies are shown by the facts to subsidize, approve of, or encourage private interests and such private interests happen also to restrict the liberty to speak and to dissent, this court may find that such private restrictions run afoul

---

[16] As we previously noted, the Washington Supreme Court explicitly has confined its holding in *Alderwood Associates*. See footnote 13 of this opinion.

[17] The court in *Bock* also recognized that the free speech provision of the state constitution extended "beyond the negative command of its first clause to make an affirmative declaration in the second clause." *Bock* v. *Westminster Mall Co.*, supra, 819 P.2d 58. Article II, § 10, of the Colorado constitution provides in relevant part: "No law should be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject . . . ."

of the protective scope of [Colorado's free speech clause]. It is possible for interests, otherwise private, to bear such a close relationship with governmental entities or public monies that such interests are affected with a public interest. Moreover, with or without the benefit of that relationship, a private project may develop and operate in a manner such that it performs a virtual public function." Id., 60.

Noting that its finding of governmental involvement in the case was not predicated on any single factor, the court in *Bock* found significant the city's $2 million purchase, financed through the sale of municipal bonds, of the street and sewer improvements that initially had been paid for by the mall's developer. Id., 61. The court also was persuaded by the fact that the city operated a police "substation" in the mall. Id. From the substation, the police responded to complaints throughout the city. The court reasoned that, because the mall provided the space free of rent, the mall was providing a municipal service. In addition, the court noted the presence of two to four city police officers routinely patrolling the common areas of the mall. Id. The court further identified a "highly visible governmental presence" in the mall, consisting of Army, Navy and Marine Corps recruiting offices, as well as voter registration drives conducted by the county clerk. Id., 62. Finally, the court expressed its belief that the mall functioned "as the equivalent of a downtown business district" and thus concluded that the mall constituted a public forum. Id.

In *New Jersey Coalition Against War in the Middle East* v. *J.M.B. Realty Corp.*, 138 N.J. 326, 333, 650 A.2d 757 (1994), cert. denied sub nom. *Short Hill Associates* v. *New Jersey Coalition Against War in the Middle East*, 516 U.S. 812, 116 S. Ct. 62, 133 L. Ed. 2d 25 (1995), the New Jersey Supreme Court held that regional and community shopping centers must permit leafletting

on "societal issues" because, "[a]lthough the ultimate purpose of these shopping centers is commercial, their normal use is all-embracing, almost without limit, projecting a community image, serving as their own communities, encompassing practically all aspects of a downtown business district, including expressive uses and community events." Applying a multifactored approach that it first had enunciated in *State* v. *Schmid*, 84 N.J. 535, 563, 423 A.2d 615 (1980),[18] appeal dismissed sub nom. *Princeton University* v. *Schmid*, 455 U.S. 100, 102 S. Ct. 867, 70 L. Ed. 2d 855 (1982), the court found that several elements supported its conclusion that the malls in question, although privately owned property, were nonetheless subject to the state's constitutional free speech guarantee.[19] *New Jersey Coalition Against War in the Middle East* v. *J.M.B. Realty Corp.*, supra, 362. First, the court took extensive note of the open and inviting nature of malls, noting that, although the primary purpose of the shopping centers may be profit, the "all-inclusiveness" of the property invites the public to do more than just shop. Id., 357–58. "The activities and uses, the design of the property, the open spaces, the non-retail activities, the expressive uses, all are designed to make the [shopping] centers attractive to everyone, for all purposes, to make them a magnet for all people, not just shoppers. The hope is that once

[18] "This standard must take into account (1) the nature, purposes, and primary use of such private property, generally, its 'normal' use, (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property." *State* v. *Schmid*, supra, 84 N.J. 563.

[19] The New Jersey Supreme Court took note of the expansive size of the malls in question in that case and the large populations that they served, as well as the fact that some of those malls were patrolled by police officers and that at least one of those malls housed a municipal police substation. *New Jersey Coalition Against War in the Middle East* v. *J.M.B. Realty Corp.*, supra, 138 N.J. 338–40. Such facts, however, did not play an important role in the court's analysis.

there they will spend. The certainty is that if they are not there they will not." Id., 358.

The New Jersey Supreme Court also took note of the fact that, in addition to the implicit invitation that was communicated by the design and use of the shopping centers, some of the malls in question explicitly authorized certain kinds of speech, such as that which occurred at community desks or booths, as well as political speech at voter registration drives and candidate appearances. Id., 358–60. In its opinion, the court documented the rise of the large privately owned shopping mall and the converse decline of the downtown business districts; id., 344–47; and finally concluded that any harm to the business interests of the mall that came from leafletting could be mitigated by the proper adoption of rules and regulations concerning the time, place and manner of such leafletting. Id., 361–62.

### III

The plaintiff in the present case does not request that we overturn our ruling in *Cologne* that the Connecticut constitution requires state action, but instead urges us to decide a question not addressed by that decision: whether the provisions of our constitution are satisfied by a showing of less state action than what generally has been required under their federal counterparts.[20]

---

[20] As explained by one commentator, there are at least three prominent bright-line federal tests used to determine whether a court can treat a private defendant as a state actor. Those tests are identified as the "[e]xclusive [government] [f]unction" (or "public function") test, the "[s]ymbiotic [r]elationship" test and the "nexus" test. R. Krotoszynski, "Back to the Briarpatch: An Argument in Favor of Constitutional Meta-Analysis in State Action Determinations," 94 Mich. L. Rev. 302, 318–20 (1995); see, e.g., *Flagg Bros., Inc.* v. *Brooks*, 436 U.S. 149, 157–61, 98 S. Ct. 1729, 56 L. Ed. 2d 185 (1978) (explaining that state action arises when private actor engages in "an *exclusively public function*" [emphasis added]); *Jackson* v. *Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974) ("the inquiry must be whether there is a sufficiently close *nexus* between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself" [emphasis added]); *Burton* v. *Wilmington Parking Authority*, 365 U.S. 715, 725, 81 S. Ct. 856, 6 L. Ed.

The plaintiff contends that the absence of federalism concerns,[21] especially in light of the "increasing tendency of this court in the years since *Cologne* to protect constitutional rights to speech," favors a more expansive view of state action. The plaintiff argues that since *Cologne*, decisions by this court have adopted an approach to free speech analysis that is far more protective of constitutional rights than that employed in *Cologne*.

Specifically, the plaintiff calls our attention to *State v. Linares*, 232 Conn. 345, 379–81, 655 A.2d 737 (1995), in which we adopted a "fact-specific, flexible" approach[22] for claims involving restrictions of speech on public property despite the fact that the United States Supreme Court no longer utilized such an approach. See *Leydon* v. *Greenwich*, 257 Conn. 318, 347–49, 777 A.2d 552 (2001) (discussing this court's analysis in *Linares*). In *Linares*, we recognized the important value of the freedom of speech under the state constitution and held that article first, §§ 4 and 5, were not subject to the same stringent limitations as would be required under a federal first amendment analysis. *State v. Linares*, supra, 380–83. As the defendant notes, how-

2d 45 (1961) (focusing on symbiotic relationship between private entity and government in order to determine whether state "must be recognized as a joint participant in the challenged activity").

[21] As the plaintiff points out, federalism concerns that may inhibit the United States Supreme Court's interpretation of the United States constitution are not implicated when this court interprets the constitution of Connecticut. "In part, at least, the state action requirement is designed to address the demands of federalism, to create space for state regulation. L. Tribe, American Constitutional Law, pp. 1149–50 (1978). Because there is no 'federalism' component to state action under state constitutions, any state standard for government involvement should be more flexible, and should require less definitive government action than is required under federal law." *Cologne* v. *Westfarms Associates*, supra, 192 Conn. 82 (*Peters, J.*, dissenting).

[22] Under such a fact-specific, flexible approach, a court's first amendment analysis relies on whether the particular speech at issue is consistent with the uses of the specific public property involved. See *Grayned* v. *Rockford*, 408 U.S. 104, 116–17, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972).

ever, in *Linares*, the issue was whether the defendant's free speech rights on the *public* property where she was arrested had been impaired. Id., 379. That case, therefore, is of limited value in determining whether *private* property has, by some involvement or relationship with government, been transformed into public property.

The plaintiff nonetheless argues that the true precedential value of *Linares* is this court's rejection of a categorical bright-line test in favor of a fact-specific balancing approach,[23] as well as its willingness to revive analytical approaches that are not currently in vogue.[24] In this vein, the plaintiff urges us to adopt the approach taken in *Janusaitis* v. *Middlebury Volunteer Fire Dept.*, 607 F.2d 17 (2d Cir. 1979), in which a former volunteer fireman sued the volunteer fire department, its chief and the members of its executive committee, alleging that his suspension and dismissal violated his right to free speech under the constitution of the United States. *Janusaitis* involved, in part, the issue of whether the plaintiff had alleged sufficient state action to implicate the first amendment. Instead of employing one bright-

---

[23] The plaintiff also calls our attention to *State* v. *Morales*, 232 Conn. 707, 719–27, 657 A.2d 585 (1995), in which we rejected a single factor federal approach in favor of a balancing test under a due process analysis pursuant to article first, § 8, of the constitution of Connecticut.

[24] We note that in its amicus brief in support of the plaintiff, the Connecticut Civil Liberties Union Foundation refers us to even more jurisprudential possibilities of federal precedents we could revive in order to create a new state action litmus test. See *Jackson* v. *Statler Foundation*, 496 F.2d 623, 629 (2d Cir. 1973) ("five factors . . . are particularly important to a determination of 'state action': [1] the degree to which the 'private' organization is dependent on governmental aid; [2] the extent and intrusiveness of the governmental regulatory scheme; [3] whether that scheme connotes government approval of the activity or whether the assistance is merely provided to all without such connotation; [4] the extent to which the organization serves a public function or acts as a surrogate for the [s]tate; [5] whether the organization has legitimate claims to recognition as a 'private' organization in associational or other constitutional terms"), cert. denied, 420 U.S. 927, 95 S. Ct. 1124, 43 L. Ed. 2d 397 (1975).

line test, the Second Circuit Court of Appeals engaged in what has become known as "meta-analysis." Id., 23; see R. Krotoszynski, "Back to the Briarpatch: An Argument in Favor of Constitutional Meta-Analysis in State Action Determinations," 94 Mich. L. Rev. 302 (1995). That type of analysis involves the use of more than one type of test in order to determine whether, under the particular facts of a case, there is sufficient state action. R. Krotoszynski, supra, 304 and n.15. In *Janusaitis*, the court analyzed the plaintiff's claim under a combination of two distinct federal tests—the "public function" test, in which the inquiry focuses on "the nature of the function performed" by a private actor, and asks whether, historically, such a function has been reserved exclusively to the government, *and* the "symbiotic relationship" test, in which the inquiry focuses on the degree of government involvement and the extent to which the state "must be recognized as a joint participant in the challenged activity . . . ." (Internal quotation marks omitted.) *Janusaitis* v. *Middlebury Volunteer Fire Dept.*, supra, 23. According to the plaintiff in the present case, the court's willingness in *Janusaitis* to rely on an amalgamation of federal schemes, ultimately to conclude that the defendants were state actors, is consistent with our fact-specific approach in *Linares* and, therefore, an appropriate way to analyze the state action issue presented here.[25]

Similarly, the plaintiff also directs our attention to *Brentwood Academy* v. *Tennessee Secondary School*

---

[25] The defendant argues that the plaintiff's proposed approach involving a balancing test, wherein the court would weigh the right of free speech against the interests of operating private property for business purposes, would interfere with the role of the legislature, and therefore presents a separation of powers dilemma. The defendant also contends that, should this court go so far as to recognize a state constitutional right of access for "expressive" activity on *private* property, like shopping malls, we then may be obligated to expand constitutional guarantees in other contexts that do not involve state action. Because we are affirming the trial court's judgment, we need not address these concerns.

*Athletic Assn.*, 531 U.S. 288, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001), which, the plaintiff contends, heralds a rejection of any bright-line test that the Supreme Court has relied upon in the past in favor of a fact-specific balancing approach. In *Brentwood Academy*, the court engaged in an extensive factual examination of the relationship between the defendant, a statewide association incorporated to regulate interscholastic athletic competition among public and private secondary schools, and the state before concluding that the defendant was a state actor for purposes of the fourteenth amendment to the United States constitution. In reaching that conclusion, the court noted: "What is fairly attributable [as state action] is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the [s]tate behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient . . . ." Id., 295. Referring to previously enunciated state action standards, the court further stated that "[w]hen . . . the relevant facts show persuasive entwinement . . . the implication of state action is not affected by pointing out that the facts might not loom large under a different test." Id., 303.

According to the plaintiff, regardless of whether the analysis is characterized as one of the aforementioned bright-line federal standards, *Brentwood Academy*'s "entwinement" test, a "meta-analysis" as in *Janusaitis*, or simply a "fact-specific" approach, such as that used in Colorado and New Jersey, the result is the same: a review of the totality of the circumstances that, in the present case, ultimately demonstrates that the defendant is a state actor for purposes of our constitution and, therefore, unconstitutionally refused the plaintiff access to the mall. Even if we were to conclude, however, that our state action requirement is more expan-

sive than the current federal standard, under *any* of the various alternative approaches we have discussed in this opinion, we conclude that the facts in the present case *still* do not rise to the level of constituting state action.

IV

Under *Cologne*, as in the overwhelming majority of our sister jurisdictions, the size of the mall, the number of patrons it serves, and the fact that the general public is invited to enter the mall free of charge do not, even when considered together, advance the plaintiff's cause in converting private action into government action. "[P]roperty [does not] lose its private character merely because the public is generally invited to use it for designated purposes. . . . The essentially private character of a store and its privately owned abutting property does not change by virtue of being large or clustered with other stores in a modern shopping center. . . . If the furnishing of building permits, police protection and public transportation were deemed to constitute sufficient government involvement to transform the actions of the defendants in refusing the plaintiffs' requests into those of public officials . . . almost every improved property would be subject to the same burden the plaintiffs seek to impose upon the [m]all." (Citation omitted; internal quotation marks omitted.) *Cologne* v. *Westfarms Associates*, supra, 192 Conn. 66.

The plaintiff argues, however, that our state constitution permits a finding of state action based upon the contacts between the government and the private business owner present in this case, even though such contacts would not be sufficient to establish state action under the first amendment. For example, the plaintiff contends that the town of Waterford and the state were "closely involved in the construction and development of the mall," including the alteration of Route 85, the

construction of an additional lane on Interstate 95 to accommodate those exiting to the mall and the reconstruction of the Interstate 95 off-ramp. The plaintiff also points out that various zoning regulations were modified to accommodate the mall, including those which limited the height of the mall, required a certain size parking space and restricted the proximity of liquor sales outlets. Id. The plaintiff further points to all of the various state and municipal agencies that inspected the premises and imposed prerequisites to the mall's opening. Finally, the plaintiff puts great weight on the fact that the presence of the mall resulted in a " 'substantial' " impact on the fire department's budget and on the fact that the police department patrols the mall and its surrounding area and has use of a room inside the mall for limited police-related activities.[26]

As our recitation of the facts indicates, a number of town and state officers, departments and agencies were consulted in connection with the construction and opening of the mall, including: the state traffic commission, the state department of transportation, the state department of environmental protection, the state department of public health, the Waterford town planner, the Waterford department of public works, the Waterford board of police commissioners, and the Waterford fire commission. There is nothing in the record before us, however, to suggest that such involvement on the part of these agencies was unusual or extensive, particularly for a large commercial property. As the International Council of Shopping Centers, Inc., explains in its amicus brief, submitted in support of the defendant, any commercial development anywhere in this country has to comply with similar regulations.

---

[26] The plaintiff also argues that the defendant has failed to present any basis for a finding that it would be harmed by a decision in the plaintiff's favor. Such a determination, however, is not required for our conclusion.

Specifically, for example, the parties' stipulation reveals that neither the mall nor any other commercial business in the community is billed for general police patrol services, unless it is a specific request for an extra duty job. Likewise, the state fire code applies to all municipalities within the state.[27] Therefore, all similarly situated commercial developments would be treated uniformly, and we simply do not see, based on the facts presently before us, how the mall enjoyed a "level of governmental assistance far beyond that enjoyed by the owners of other developed property." There is no evidence that the mall has received benefits that other private properties have not received; in fact, there is no evidence at all regarding the practices of other commercial developers or the regulations that govern their projects. We recognize that the larger the construction project, the more contacts there are likely to be, but, in our view, the number of meetings or permits required does not serve to change the legal status of the party by transforming it into a state actor for purposes of a constitutional analysis. From the record before us, therefore, "[w]e are unable . . . to discern any legal basis distinguishing this commercial complex from other places where large numbers of people congregate . . . such as sport stadiums, convention halls, theatres, country fairs, large office or apartment buildings, factories, supermarkets or department stores." *Cologne* v. *Westfarms Associates*, supra, 192 Conn. 64.

The plaintiff points to the five jurisdictions that currently conclude that a state may require private shop-

---

[27] Although the plaintiff makes much of the fact that, during the planning stages of the mall, the town of Waterford had contemplated the need to obtain additional fire and police staff and additional fire equipment, there is no evidence that those departments actually have acquired them. Furthermore, there is no factual support for the assertion that such increases would be above and beyond what otherwise might have been required during the normal course of further development in Waterford.

ping mall owners to permit some form of political activity in common areas of the mall, relying heavily on *Bock* v. *Westminster Mall Co.*, supra, 819 P.2d 55, which bears the closest factual resemblance to the circumstances in the present case. Specifically, the plaintiff points out the expansive size of both the mall in *Bock* and the mall at issue here. In both malls, the common areas are open to the public free of charge and the mall management has allowed, and even invited, certain civic and nonprofit groups to disseminate information to mall shoppers. The plaintiff also points to the existence of a police "substation" at the mall, which it argues is similar to the one in *Bock*. From our review of the record, however, the area for police use at the mall, whatever its exact nature, is entirely distinguishable from the police "substation" in *Bock*. As the parties' stipulation indicates, the police merely have "access" to a room for the purpose of "writing reports affiliated with activity at the mall . . . and for interviewing people or suspects." Without more detailed information, we cannot agree that such use of a room rises to the level of what we typically understand a police substation to involve—a place where almost all of the work entailed in police business could be conducted. In addition, unlike what appears to be the case in *Bock*, here there is no exclusive permanent police presence. Instead, officers are assigned to the mall as part of a patrol zone. Even the extra officer assigned to the mall during the holiday period patrols more than just the mall; that officer also is responsible for the safety and security of surrounding area stores. More importantly, however, we note that there is no evidence that *any* of the numerous changes to the land upon which the mall sits or the roads that surround it were purchased or paid for by the town or the state,[28] unlike the situation

---

[28] According to the parties' stipulation, the certificate issued by the state traffic commission would become valid only upon "*the developer's completion* of a number of conditions . . . ." (Emphasis added.) These conditions included major changes to Route 85 and Interstate 95 and the installation of

in *Bock,* wherein the city had purchased, via the sale of municipal bonds, street and sewer improvements that initially had been paid for by a private developer.

Even taking into account those factors that the plaintiff propounds, we fail to see how the defendant in the present case could be deemed a state actor. To conclude that the minimal state involvement present in this case was sufficient to constitute state action, we would have to disregard much of the reasoning in *Cologne* that differentiated between state and private action, essentially eviscerate *Cologne*'s conclusion that the public use of a private shopping mall did not transform the mall owners' refusal to allow political speech within the mall into state action, and depart drastically from the case law, relying in part on *Cologne,* in the overwhelming majority of other jurisdictions. See footnote 14 of this opinion. We do not, however, foreclose the possibility that a proper interpretation of the Connecticut constitution *could* lead to the conclusion that our state action requirement is more expansive than its federal counterpart. After all, "[w]e have . . . determined in some instances that the protections afforded to the citizens of this state by our own constitution go beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. *State* v. *Dukes,* 209 Conn. 98, 112, 547 A.2d 10 (1988); *State* v *Stoddard,* 206 Conn. 157, 166, 537 A.2d 446 (1988); *State* v. *Kimbro,* 197 Conn. 219, 235–36, 496 A.2d 498 (1985)." *State* v. *Marsala,* 216 Conn. 150, 160, 579 A.2d 58 (1990). Thus, should an appropriate case present itself, we may reconsider the issue; see, e.g., *State* v. *Hinton,* 227 Conn. 301, 331–32, n.27, 630 A.2d 593 (1993); *State* v. *Avis,* 209 Conn. 290,

traffic lights in order to accommodate mall traffic. In addition, the stipulation indicated that the state traffic commission had "reserved the right to implement additional traffic controls as it might deem necessary in the future, with *all costs to be borne by the owner of the [m]all.*" (Emphasis added.)

297 n.6, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989); using the factors we enunciated in *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992), to guide our decision.[29] We therefore leave for another day the determination of the exact contours of our state action doctrine, and thus, whether to deviate from the federal model.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[29] We note that the plaintiff, in its brief, engaged in a detailed *Geisler* analysis of article first, §§ 4, 5 and 14, of the constitution of Connecticut to support its conclusion that the state action requirement of the state constitution differs from the United States constitution. See *State* v. *Geisler*, supra, 222 Conn. 684–85 ("[i]n order to construe the contours of our state constitution and reach reasoned and principled results, the following tools of analysis should be considered to the extent applicable: [1] the textual approach . . . [2] holdings and dicta of this court, and the Appellate Court . . . [3] federal precedent . . . [4] sister state decisions or sibling approach . . . [5] the historical approach, including the historical constitutional setting and the debates of the framers . . . and [6] economic/sociological considerations" [citations omitted]).