[No. S144753. Dec. 24, 2007.]

FASHION VALLEY MALL, LLC, Petitioner, v.
NATIONAL LABOR RELATIONS BOARD, Respondent;
GRAPHIC COMMUNICATIONS INTERNATIONAL UNION, LOCAL
432-M, Real Party in Interest.

## COUNSEL

Law Offices of W. McLin Lines, W. M. Lines; Luce, Forward, Hamilton & Scripps, Littler Mendelson and Theodore R. Scott for Petitioner.

Katten Muchin Rosenman, Thomas J. Leanse, Stacey McKee Knight; Law Offices of Jo Anne M. Bernhard and Jo Anne M. Bernhard for International Council of Shopping Centers and California Business Properties Association as Amici Curiae on behalf of Petitioner.

David A. Habenstreit, Anne Marie Lofaso, Arthur F. Rosenfeld, John E. Higgins, Jr., Margery E. Lieber and Aileen A. Armstrong for Respondent.

Weinberg, Roger & Rosenfeld, David A. Rosenfeld, Caren P. Sencer, Richard D. Prochazka & Associates and Richard D. Prochazka for Real Party in Interest.

Law Offices of Carroll & Scully, Donald C. Carroll and Charles P. Scully II for California Labor Federation, AFL-CIO, as Amicus Curiae on behalf of Real Party in Interest.

Alan Schlosser; Peter Eliasberg; and David Blair-Loy for American Civil Liberties Union of Northern California, American Civil Liberties Union of Southern California and American Civil Liberties Union of San Diego and Imperial Counties as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**MORENO, J.**—We granted the request of the United States Court of Appeals for the District of Columbia Circuit to decide whether, under California law, a shopping mall may enforce a rule prohibiting persons from

urging customers to boycott a store in the mall. For the reasons that follow, we hold that the right to free speech granted by article I, section 2 of the California Constitution includes the right to urge customers in a shopping mall to boycott one of the stores in the mall.

FACTS

On October 15, 1998, Graphic Communications International Union, Local 432-M (Union) filed a charge before the National Labor Relations Board (NLRB) alleging that the owners of the Fashion Valley Mall (Mall) in San Diego had "refused to permit employees of the Union-Tribune Publishing Company to leaflet in front of Robinsons-May" department store in the Mall. The NLRB issued a complaint and noticed a hearing, after which an administrative law judge ruled that the Mall had violated section 8(a)(1) of the National Labor Relations Act (29 U.S.C. § 158(a)(1)) by barring the employees from distributing leaflets.[1]

The administrative law judge found that the Union "represents a unit of the pressroom employees at The San Diego Union-Tribune (Union-Tribune), a major general circulation newspaper in San Diego." The collective bargaining agreement between the employees and the newspaper had expired in 1992 and the parties had been unable to reach a new agreement. The administrative law judge thus found that a "primary labor dispute" existed between the newspaper and its employees at the time of the disputed labor activities in 1998.

On October 4, 1998, 30 to 40 Union members had distributed leaflets to customers entering and leaving the Robinsons-May store at the Mall.[2] The leaflets stated that Robinsons-May advertises in the Union-Tribune, described several ways that the newspaper allegedly treated its employees unfairly, and urged customers who believed "that employers should treat employees fairly" to call the newspaper's "CEO," listing his name and telephone number. The administrative law judge concluded: "From all indications, the leafleters conducted their activity in a courteous and peaceful manner without a disruption of any kind and without hindrance to customers entering or leaving" the store.

---

[1] The National Labor Relations Act provides that it is an unfair labor practice for an employer to "interfere with, restrain, or coerce employees" in the exercise of certain rights, including "the right to self-organization, to form, join, or assist labor organizations, . . . and to engage in other concerted activities for the purpose of collective bargaining . . . ." (29 U.S.C. §§ 158(a)(1), 157 [barring interference with rights in § 157 (§ 7 of act)].)

[2] In addition to Robinsons-May, the Fashion Valley Mall includes Nordstrom, Neiman Marcus, Saks Fifth Avenue, Macy's, and JCPenney department stores, as well as an 18-theater movie complex. The mall is surrounded by parking structures and lots.

Within 15 or 20 minutes, Mall officials "arrived on the scene to stop the leafleting," notifying the Union members that they were trespassing because they had not obtained a permit from the Mall "to engage in expressive activity," and warning them that they "would be subject to civil litigation and/or arrest if they did not leave." A police officer appeared and, following a brief argument, the Union members moved to public property near the entrance to the Mall and continued distributing leaflets briefly before leaving the area.

The Mall has adopted rules requiring persons who desire to engage in expressive activity at the Mall to apply for a permit five business days in advance. The applicant "must agree to abide by" the Mall's rules, including rule 5.6, which prohibits "impeding, competing or interfering with the business of one or more of the stores or merchants in the shopping center by: [¶] . . . [¶] 5.6.2 Urging, or encouraging in any manner, customers not to purchase the merchandise or services offered by any one or more of the stores or merchants in the shopping center."

The administrative law judge found that the Union "was attempting to engage in a lawful consumer boycott of Robinsons-May because Robinsons-May advertised in the Union-Tribune newspaper" and further found "that it would have been utterly futile for the Union to have followed [the Mall]'s enormously burdensome application-permit process because its rules contained express provisions barring the very kind of lawful conduct the Union sought to undertake at the Mall." The administrative law judge thus ordered the Mall to cease and desist prohibiting access to the Union's "leafleters for the purpose of engaging in peaceful consumer boycott handbilling."

On September 26, 2001, the matter was transferred to the NLRB in Washington, D.C. On October 29, 2004, the NLRB issued an opinion affirming as modified the administrative law judge's decision. Citing our decision in *Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341], affirmed *sub nomine Pruneyard Shopping Center v. Robins* (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035], the NLRB stated: "California law permits the exercise of speech and petitioning in private shopping centers, subject to reasonable time, place, and manner rules adopted by the property owner. [Citations.] Rule 5.6.2, however, is essentially a content-based restriction and not a time, place, and manner restriction permitted under California law. That is, the rule prohibits speech 'urging or encouraging in any manner' customers to boycott one of the shopping center stores. . . . [I]t appears that the purpose and effect of this rule was to shield [the Mall]'s tenants, such as the Robinsons-May department store, from otherwise lawful consumer boycott handbilling. Accordingly, we find that [the Mall] violated Section 8(a)(1) by maintaining Rule 5.6.2. [Citation.]" (Fn. omitted.)

. The Mall petitioned for review before the United States Court of Appeals for the District of Columbia Circuit, which issued an opinion on June 16, 2006. The court of appeals stated it had to resolve two issues: "(1) State law aside, did [the Mall]'s requirement of a permit for expressive activity, conditioned as it was upon the Union's agreement not to urge a boycott of any Mall tenant, violate § 8(a)(1) of the Act? (2) If so, was [the Mall] acting within its rights under California law?" The court answered the first question in the affirmative, which meant that the case turned on the resolution of the second question. The court addressed this question of California law as follows: "Although [the Mall] is correct that there is not substantial evidence the Union intended to boycott any of the Mall's tenants, nothing in the Act prohibits the Union from carrying out a secondary boycott[3] by means of peaceful handbilling. [Citation.] In subjecting the Union to a permit process that required it to forswear use of this lawful tactic, therefore, [the Mall] interfered with the employees' rights under § 7 of the Act. . . . Enforcement of Rule 5.6.2 therefore violated § 8(a)(1)—unless, that is, the Company had the right under California constitutional law to exclude the employees altogether." The court of appeals observed that "no California court has squarely decided whether a shopping center may lawfully ban from its premises speech urging the public to boycott a tenant," and concluded that "whether [the Mall] violated § 8(a)(1) of the Act depends upon whether it could lawfully maintain and enforce an anti-boycott rule—a question no California court has resolved." Accordingly, the United States Court of Appeals for the District of Columbia Circuit filed in this court a request,[4] which we granted, to decide the following question: "Under California law may Fashion Valley maintain and enforce against the Union its Rule 5.6.2?"

## DISCUSSION

■ Article I, section 2, subdivision (a) of the California Constitution declares: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Nearly 30 years ago, in *Robins v. Pruneyard Shopping Center, supra*, 23 Cal.3d 899, 910 (*Pruneyard*), we held that this provision of our state Constitution grants broader rights to free expression than does the First Amendment to the United States Constitution by holding that a shopping mall is a public forum in which

---

[3] A "secondary boycott" is "union activity directed against a neutral employer." (*NLRB v. Pipefitters* (1977) 429 U.S. 507, 534 [51 L.Ed.2d 1, 97 S.Ct. 891].)

[4] Rule 8.548(a) of the California Rules of Court, which replaced former rule 29.8(a), states: "On request of the United States Supreme Court, a United States Court of Appeals, or the court of last resort of any state, territory, or commonwealth, the Supreme Court may decide a question of California law if: [¶] (1) The decision could determine the outcome of a matter pending in the requesting court; and [¶] (2) There is no controlling precedent."

persons may exercise their right to free speech under the California Constitution. We stated that a shopping center "to which the public is invited can provide an essential and invaluable forum for exercising [free speech] rights." (*Pruneyard*, at p. 910.) We noted that in many cities the public areas of the shopping mall are replacing the streets and sidewalks of the central business district, which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." (*Hague v. C. I. O.* (1939) 307 U.S. 496, 515 [83 L.Ed. 1423, 59 S.Ct. 954].) Because of the "growing importance of the shopping center[,] . . . to prohibit expressive activity in the centers would impinge on constitutional rights beyond speech rights," particularly the right to petition for redress of grievances. (*Pruneyard, supra,* 23 Cal.3d at p. 907.) Accordingly, we held that the California Constitution "protect[s] speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." (*Id.* at p. 910.) We added the caveat in *Pruneyard* that "[b]y no means do we imply that those who wish to disseminate ideas have free rein," noting our previous "endorsement of time, place, and manner rules." (*Ibid.*)

The Mall in the present case generally allows expressive activity, as mandated by the California Constitution, but requires persons wishing to engage in free speech in the Mall to obtain a permit. Under rule 5.6.2, the Mall will not issue a permit to engage in expressive activity unless the applicant promises to refrain from conduct "[u]rging, or encouraging in any manner, customers not to purchase the merchandise or services offered by any one or more of the stores or merchants in the shopping center." We must determine, therefore, whether a shopping center violates California law by banning from its premises speech urging the public to boycott one or more of the shopping center's businesses.

■ The idea that private property can constitute a public forum for free speech if it is open to the public in a manner similar to that of public streets and sidewalks long predates our decision in *Pruneyard*. The United States Supreme Court recognized more than a half-century ago that the right to free speech guaranteed by the First Amendment to the United States Constitution can apply even on privately owned land. In *Marsh v. Alabama* (1946) 326 U.S. 501, 502 [90 L.Ed. 265, 66 S.Ct. 276], the high court held that a Jehovah's Witness had the right to distribute religious literature on the sidewalk near the post office of a town owned by the Gulf Shipbuilding Corporation, because the town had "all the characteristics of any other American town. . . . In short the town and its shopping district are accessible to and freely used by the public in general and there is nothing to distinguish them from any other town and shopping center except the fact that the title to the property belongs to a private corporation." (*Id.* at pp. 502–503.) ■ The high court stated: "The more an owner, for his advantage, opens up his property for use by the

public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." (*Id.* at p. 506.)

This court followed the high court's decision in *Marsh* to hold that a shopping center could not prohibit a union's peaceful picketing of one of the shopping center's stores. (*Schwartz-Torrance Investment Corp. v. Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766 [40 Cal.Rptr. 233, 394 P.2d 921] (*Schwartz-Torrance*).) We recognized that peaceful picketing by a labor union "involves an exercise of the constitutionally protected right of freedom of speech." (*Id.* at p. 769.) We rejected the shopping center's argument that its right to "the exclusive possession and enjoyment of private property" outweighed the union's right to picket: "Because of the public character of the shopping center, however, the impairment of plaintiff's interest must be largely theoretical. Plaintiff has fully opened his property to the public." (*Id.* at p. 771.)

In *In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353], we reiterated that private property that was open to the public in the same manner as public streets or parks could constitute a public forum for free expression, holding that protesters had the right to express their opposition to the war in Vietnam by distributing leaflets in Union Station in Los Angeles, "a spacious area open to the community as a center for rail transportation" that was owned by three railroad companies. (*Id.* at p. 847.) This court reasoned that, with regard to distributing leaflets, "a railway station is like a public street or park. Noise and commotion are characteristic of the normal operation of a railway station. The railroads seek neither privacy within nor exclusive possession of their station. They therefore cannot invoke the law of trespass against petitioners to protect those interests. [¶] Nor was there any other interest that would justify prohibiting petitioners' activities. Those activities in no way interfered with the use of the station. They did not impede the movement of passengers or trains, distract or interfere with the railroad employees' conduct of their business, block access to ticket windows, transportation facilities or other business legitimately on the premises. Petitioners were not noisy, they created no disturbance, and did not harass patrons who did not wish to hear what they had to say. [¶] Had petitioners in any way interfered with the conduct of the railroad business, they could legitimately have been asked to leave." (*Id.* at pp. 851–852, fn. omitted.)

In *In re Lane* (1969) 71 Cal.2d 872 [79 Cal.Rptr. 729, 457 P.2d 561], we applied our earlier holding in *Schwartz-Torrance* to conclude that a union had a right to distribute handbills on a privately owned sidewalk outside a business. We held that the sidewalk "is not private in the sense of not being open to the public. The public is openly invited to use it in gaining access to the store and in leaving the premises." (*Id.* at p. 878.) We held, therefore, that

the privately owned sidewalk was "a public area in which members of the public may exercise First Amendment rights," including peacefully distributing handbills: "[W]hen a business establishment invites the public generally to patronize its store and in doing so to traverse a sidewalk opened for access by the public the fact of private ownership of the sidewalk does not operate to strip the members of the public of their rights to exercise First Amendment privileges on the sidewalk at or near the place of entry to the establishment. In utilizing the sidewalk for such purposes those seeking to exercise such rights may not do so in a manner to obstruct or unreasonably interfere with free ingress or egress to or from the premises." (*Ibid.*)

During the interim between our decisions in *Schwartz-Torrance* and *Lane*, the United States Supreme Court adopted a similar position, holding in *Food Employees v. Logan Plaza* (1968) 391 U.S. 308 [20 L.Ed.2d 603, 88 S.Ct. 1601] (disapproved in *Hudgens v. NLRB* (1976) 424 U.S. 507, 518 [47 L.Ed.2d 196, 96 S.Ct. 1029]), that peaceful picketing by union members of a business in a shopping center that employed nonunion workers was protected by the First Amendment. The high court observed that the shopping center in *Logan Plaza* "is clearly the functional equivalent of the business district" in *Marsh.* (*Food Employees v. Logan Plaza, supra*, 391 U.S. at p. 318.) The high court emphasized the importance of recognizing a union's right to peacefully picket in a shopping center: "Business enterprises located in downtown areas would be subject to on-the-spot public criticism for their practices, but businesses situated in the suburbs could largely immunize themselves from similar criticism by creating a *cordon sanitaire* of parking lots around their stores. Neither precedent nor policy compels a result so at variance with the goal of free expression and communication that is the heart of the First Amendment." (*Id.* at pp. 324–325.)

In *Diamond v. Bland* (1970) 3 Cal.3d 653 [91 Cal.Rptr. 501, 477 P.2d 733] (*Diamond I*), we went one step further than the decision in *Logan Plaza*. *Logan Plaza* held that a shopping center could not prohibit a union from peacefully picketing one of the stores in the center, but the issue in *Diamond I* was whether a privately owned shopping center could prohibit free speech activity that was *unrelated* to the business of the center. In *Diamond I*, a large privately owned shopping center refused to allow a group called the People's Lobby to solicit signatures on two antipollution initiative petitions. We noted that the United States Supreme Court had held in *Logan Plaza* that "a shopping center could not absolutely prohibit union picketing of a business located within the Center," but had "expressly declined to decide whether 'respondents' property rights could, consistently with the First Amendment, justify a bar on picketing which was not thus directly related in its purpose to the use to which the shopping center property was being put.' [Citation.]" (*Id.* at p. 661.) We observed that, prior to the decision in *Logan Plaza*, we had "reached an identical result" in *Schwartz-Torrance*, holding

that a shopping center could not prohibit peaceful union picketing of a business in the center and, in *Lane,* had extended that holding to apply to a privately owned sidewalk in front of a business. (*Ibid.*) We concluded that it was settled that a shopping center could not prohibit free speech activity, such as union picketing, that was related to the business of the shopping center: "This series of cases involving union picketing in shopping centers establishes constitutional protection for picketing and other First Amendment activities which are related in their purpose to the normal use to which the shopping center property is devoted." (*Ibid.*)

The issue presented in *Diamond I* was whether a privately owned shopping center could prohibit free speech activity that was *unrelated* to the business of the shopping center. We acknowledged that it was relevant that in both *Schwartz-Torrance* and *Logan Plaza* "the unions involved were picketing businesses located within the shopping centers," because that fact "strengthened the interest of the petitioners in their exercise of the First Amendment activities inside the shopping centers." (*Diamond I, supra,* 3 Cal.3d 653, 662.) We explained: "When the activity to be protected is the right to picket an employer, the location of the employer's business is often the only effective locus; alternative locations do not call attention to the problem which is the subject of the picketing and may fail to apply the desired economic pressure." (*Ibid.*) But even though the interest in conducting free speech activity that is unrelated to the business of the shopping center is significantly less than the interest of a union to picket a business, it remained sufficiently substantial to outweigh the owner's interest in prohibiting such activity: "Therefore, although there is arguable merit to defendants' position that plaintiffs' interest in the exercise of their First Amendment rights at the Center may be less compelling than the First Amendment interests involved in *Schwartz-Torrance, Logan,* and *Lane,* their contention does not justify striking the balance in favor of defendants' property rights. As we have explained, plaintiffs' interest is of significant constitutional dimension, while defendants' concern is no stronger than the interests of the property owners in *Schwartz-Torrance, Logan,* and *Lane.*" (*Id.* at p. 663.) Thus, a privately owned shopping center must permit not only peaceful picketing of businesses in the center, but also free speech activity that is unrelated to the business of the shopping center.

Two years later, the United States Supreme Court in *Lloyd Corp. v. Tanner* (1972) 407 U.S. 551 [33 L.Ed.2d 131, 92 S.Ct. 2219], took a different course and disagreed with our decision in *Diamond I,* holding to the contrary that a privately owned shopping center could prohibit First Amendment activity that was unrelated to the business of the center.

In light of the high court's decision in *Lloyd,* we reconsidered our decision in *Diamond I* and, in *Diamond v. Bland* (1974) 11 Cal.3d 331, 332 [113

Cal.Rptr. 468, 521 P.2d 460] (*Diamond II*), held that a privately owned shopping center could prohibit free speech activity that was unrelated to the operation of the shopping center. Justice Mosk, joined by Justice Tobriner and, in part, by Justice Sullivan, filed a lengthy and impassioned dissent, urging the court to adhere to its decision in *Diamond I* on the basis of the California Constitution. He wrote: "For a number of years cases in this state even prior to the federal decision in [*Logan Plaza*] have held that union members enjoy the right to picket an employer on the property of a privately owned shopping center. These decisions emphasized that an employee who sought to bring his grievance to the attention of the public and apply economic sanctions against his employer could effectively do so only at the place where the business was located, and that any incidental impairment of the shopping center owner's property rights was largely theoretical since he had opened his premises to the public and his right in the property was 'worn thin by public usage.' [Citations.] . . . [¶] The *Diamond* [*I*] opinion recognized that although *Schwartz-Torrance* and *Lane* were factually distinguishable in some respects, the distinction did not justify striking a new balance to limit plaintiff's freedom of expression." (*Diamond II, supra*, 11 Cal.3d 331, 341 (dis. opn. of Mosk, J.).)

■ The United States Supreme Court then abandoned its holding in *Logan Plaza* that a shopping center could not prohibit a union from peacefully picketing one of the stores in the center by holding in *Hudgens v. NLRB, supra*, 424 U.S. 507, 518, that "the reasoning of the Court's opinion in *Lloyd* cannot be squared with the reasoning of the Court's opinion in *Logan* [*Plaza*]." The United States Supreme Court thus held that the First Amendment did not guarantee the right to free speech in a shopping mall. This court, however, did not follow the lead of the high court. Rather, we heeded the wisdom of Justice Mosk's dissent in *Diamond II* and held in *Pruneyard* that the California Constitution granted a right to free speech in a privately owned shopping center. (*Pruneyard, supra*, 23 Cal.3d 899, 902.)

■ Our decision that the California Constitution protects the right to free speech in a shopping mall, even though the federal Constitution does not, stems from the differences between the First Amendment to the federal Constitution and article I, section 2 of the California Constitution. We observed in *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 486 [101 Cal.Rptr.2d 470, 12 P.3d 720], that the free speech clause in article I of the California Constitution differs from its counterpart in the federal Constitution both in its language and its scope. "It is beyond peradventure that article I's free speech clause enjoys existence and force independent of the First Amendment's. In section 24, article I states, in these very terms, that '[r]ights guaranteed by [the California] Constitution are not dependent on those guaranteed by the United States Constitution.' This statement extends to all such rights, including article I's right to freedom of speech. For the California

Constitution is now, and has always been, a 'document of independent force and effect particularly in the area of individual liberties.' [Citations.]" (*Gerawan Farming, Inc. v. Lyons, supra,* 24 Cal.4th at pp. 489–490.) "As a general rule, . . . article I's free speech clause and its right to freedom of speech are not only as broad and as great as the First Amendment's, they are even 'broader' and 'greater.' [Citations.]" (*Gerawan Farming, Inc. v. Lyons, supra,* 24 Cal.4th 468, 491.)

In *Pruneyard, supra,* 23 Cal.3d 899, 902, high school students in the mall were prohibited from soliciting support for their opposition to a United Nations resolution against Zionism. We held that the mall could not prohibit the students' efforts despite the fact that this free speech activity was unrelated to the business of the center. (*Ibid.*) In so holding, we relied upon our earlier decision in *Schwartz-Torrance,* which, we noted, "held that a labor union has the right to picket a bakery located in a shopping center." (*Id.* at p. 909.) We cautioned, however, that we did not "imply that those who wish to disseminate ideas have free rein," noting our previous "endorsement of time, place, and manner rules." (*Id.* at p. 910.) We also repeated Justice Mosk's observation in his dissent in *Diamond II* that compelling a shopping center to permit " '[a] handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations [citation] would not markedly dilute defendant's property rights.' [Citation.]" (*Id.* at p. 911, quoting *Diamond II, supra,* 11 Cal.3d 331, 345 (dis. opn. of Mosk, J.).)[5]

The Mall argues that its rule banning speech that advocates a boycott is a "reasonable regulation" designed to assure that free expression activities "do not interfere with normal business operations" within the meaning of our decision in *Pruneyard.* (*Pruneyard, supra,* 23 Cal.3d 899, 911.) According to the Mall, it "has the right to prohibit speech that interferes with the intended purpose of the Mall," which is to promote "the sale of merchandise and services to the shopping public." We disagree.

---

[5] The shopping center in *Pruneyard* appealed our decision to the United States Supreme Court, arguing that it violated the shopping center's constitutional right to control the use of its private property. (*Pruneyard Shopping Center v. Robins, supra,* 447 U.S. 74, 79.) The high court disagreed, noting that its decision in *Lloyd* did not "limit the authority of the State to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution." (*Id.* at p. 81.) The court rejected the argument that compelling the shopping mall to permit expressive activity amounted to a taking of its private property, observing that it would not "unreasonably impair the value or use of their property as a shopping center. The PruneYard is a large commercial complex that covers several city blocks, contains numerous separate business establishments, and is open to the public at large. The decision of the California Supreme Court makes it clear that the PruneYard may restrict expressive activity by adopting time, place, and manner regulations that will minimize any interference with its commercial functions." (*Id.* at p. 83.)

■ It has been the law since we decided *Schwartz-Torrance* in 1964, and remains the law, that a privately owned shopping center must permit peaceful picketing of businesses in shopping centers, even though such picketing may harm the shopping center's business interests.[6] Our decision in *Diamond I* recognized that citizens have a strengthened interest, not a diminished interest, in speech that presents a grievance against a particular business in a privately owned shopping center, including speech that advocates a boycott.

In so holding in *Diamond I*, we added the caveats to which Justice Mosk referred in his dissent in *Diamond II, supra*, 11 Cal.3d 331, 345, which we discussed in *Pruneyard, supra*, 23 Cal.3d 899, 911, and upon which the Mall in the present case relies: that a shopping center may prohibit conduct "calculated to disrupt normal business operations" or that would result in "obstruction of or undue interference with normal business operations." (*Diamond I, supra*, 3 Cal.3d 653, 665–666.) But this does not mean that shopping centers can prohibit speech that advocates a boycott. In adding these caveats recognizing a shopping center's right to impose reasonable regulations upon expressive activity, we used as examples our decisions in *Schwartz-Torrance* and *Lane*, both of which recognized the right of a union to picket a business and advocate a boycott. We expressly noted that we were approving regulations that would impose "reasonable limitation[s] as to time, place, or manner." (*Diamond I*, at p. 665.)[7] In light of the fact that we expressly relied upon, and extended, our decisions in *Schwartz-Torrance* and *Lane*, which approved union activity advocating a boycott, it would make no sense to interpret this language in *Diamond I* (and its subsequent references

---

[6] The Mall argues that we cannot rely upon the decisions in *Schwartz-Torrance, supra*, 61 Cal.2d 766, and *In re Lane, supra*, 71 Cal.2d 872, because they were based upon the First Amendment, but we have held that the "fact that those opinions cited federal law that subsequently took a divergent course does not diminish their usefulness as precedent." (*Pruneyard, supra*, 23 Cal.3d 899, 908.) As the plurality in *Golden Gateway Center v. Golden Gateway Tenants Assn.* (2001) 26 Cal.4th 1013 [111 Cal.Rptr.2d 336, 29 P.3d 797] later observed: "Although all of these cases relied on the First Amendment and the pre-*Lloyd* decisions of the United States Supreme Court . . . *Robins* [*v. Pruneyard Shopping Center*] found many of the principles enunciated in these cases persuasive in interpreting California's free speech clause. [Citation.]" (*Id.* at p. 1032 (plur. opn. of Brown, J.), fn. omitted.)

[7] We provided examples of such regulations: "Moreover, the trial court findings in the instant action demonstrate the ability of Inland Center to regulate the various sales promotions and displays that are permitted in the common aisleways: 'In every instance where a promotion is held, it is closely regulated as to time, date, location, number of people or exhibits involved, manner of presentation and security factors.' Similar regulations, if not repressive in scope, can be devised to protect Inland Center from actual or potential danger of First Amendment activities being conducted on its premises in a manner calculated to disrupt normal business operations and to interfere with the convenience of customers." (*Diamond I, supra*, 3 Cal.3d 653, 665.)

in the dissent in *Diamond II* and the decision in *Pruneyard*) to suggest that shopping centers may prohibit speech that advocates a boycott.[8]

■ The level of scrutiny with which we review a restriction of free speech activity depends upon whether it is a content-neutral regulation of the time, place, or manner of speech or restricts speech based upon its content. A content-neutral regulation of the time, place, or manner of speech is subjected to intermediate scrutiny to determine if it is "(i) narrowly tailored, (ii) serves a significant government interest, and (iii) leaves open ample alternative avenues of communication. [Citation.]" (*Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 364 [93 Cal.Rptr.2d 1, 993 P.2d 334] (*Alliance*).) A content-based restriction is subjected to strict scrutiny. "[D]ecisions applying the liberty of speech clause [of the California Constitution], like those applying the First Amendment, long have recognized that in order to qualify for intermediate scrutiny (i.e., time, place, and manner) review, a regulation must be 'content neutral' [citation], and that if a regulation is content based, it is subject to the more stringent strict scrutiny standard. [Citation.]" (*Id.* at pp. 364–365, fn. omitted.)[9]

■ Prohibiting speech that advocates a boycott is not a time, place, or manner restriction because it is not content neutral. The Mall's rule prohibiting persons from urging a boycott is improper because it does not regulate the time, place, or manner of speech, but rather bans speech urging a boycott

---

[8] The United States Supreme Court recognized that, under the First Amendment, speech that does no more than attempt to peacefully persuade customers not to patronize a business cannot be banned on the ground that it interferes with normal business operations. The high court held that the fact that customers might be persuaded not to patronize a business did not justify restricting speech advocating a boycott: "It may be that effective exercise of the means of advancing public knowledge may persuade some of those reached to refrain from entering into advantageous relations with the business establishment which is the scene of the dispute. Every expression of opinion on matters that are important has the potentiality of inducing action in the interests of one rather than another group in society. *But the group in power at any moment may not impose penal sanctions on peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests.* . . . We hold that the danger of injury to an industrial concern is neither so serious nor so imminent as to justify the sweeping proscription of freedom of discussion . . . ." (*Thornhill v. Alabama* (1940) 310 U.S. 88, 104–105 [84 L.Ed. 1093, 60 S.Ct. 736], italics added, fn. omitted.)

This important distinction between urging customers to boycott a business and physically impeding access to that business was recognized in *People v. Poe* (1965) 236 Cal.App.2d Supp. 928 [47 Cal.Rptr. 670], which affirmed convictions for trespass of protesters who blocked the entrance to a bank, while recognizing the right of the protesters to peacefully picket, observing that the protesters "may call the bank to task for its wrongs, real or not, but they may not themselves interfere with anything but the minds of their audience." (*Id.* at p. Supp. 937.)

[9] "Clearly, government has no power to restrict [expressive] activity because of its message. Our cases make equally clear, however, that reasonable 'time, place and manner' regulations may be necessary to further significant governmental interests, and are permitted." (*Grayned v. City of Rockford* (1972) 408 U.S. 104, 115 [33 L.Ed.2d 222, 92 S.Ct. 2294], fns. omitted.)

because of its content. Restrictions upon speech " 'that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based.' [Citation.]" (*DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 877 [4 Cal.Rptr.3d 69, 75 P.3d 1].)

The Mall argues that its rule prohibiting speech that urges a boycott is "a 'content-neutral' restriction under California law because it applies to any and all requests for a consumer boycott of the Mall's merchants . . . regardless of the subject matter or viewpoint of the speaker advocating the boycott . . . ." The Mall is mistaken. The Mall's rule prohibiting all boycotts may be *viewpoint neutral*, because it treats all requests for a boycott the same way,[10] but it is not *content neutral*, because it prohibits speech that urges a boycott while permitting speech that does not.

 In *Boos v. Barry* (1987) 485 U.S. 312, 315 [99 L.Ed.2d 333, 108 S.Ct. 1157], the high court considered a provision that prohibited "the display of any sign within 500 feet of a foreign embassy if that sign tends to bring that foreign government into 'public odium' or 'public disrepute.' " This provision was content based, because whether a sign was permitted depended upon whether it was "critical of the foreign government or not. One category of speech has been completely prohibited . . . ." (*Id.* at pp. 318–319.)[11] The high court rejected the argument that the provision was content neutral because the government did not select between viewpoints, but rather prohibited all signs adverse to a foreign government's policies: "While this prevents the display clause from being directly viewpoint-based, . . . it does not render the statute content-neutral. . . . [A] regulation that 'does not favor either side of a political controversy' is nonetheless impermissible because the 'First Amendment's hostility to content-based regulation extends . . . to prohibition of public discussion of an entire topic.' [Citation.] Here the government has determined that an entire category of speech—signs or displays critical of foreign governments—is not to be permitted." (*Boos v. Barry*, at p. 319.) We find this reasoning persuasive; the Mall has prohibited an entire category of speech—speech that advocates a boycott. Thus, the Mall's rule is content based and must be given strict scrutiny. (*Alliance, supra*, 22 Cal.4th 352, 365; *U.C. Nuclear Weapons Labs Conversion Project v. Lawrence Livermore Laboratory* (1984) 154 Cal.App.3d 1157, 1170 [201 Cal.Rptr. 837].)

---

[10] The parties dispute whether the rule is viewpoint neutral. We express no view on this question.

[11] This portion of Justice O'Connor's opinion was joined by only two other justices: Justices Stevens and Scalia. But Justice Brennan made clear in his concurring opinion, which was joined by Justice Marshall, that he agreed the provision was content based and wrote separately to distance himself from other language discussing the secondary effects of the speech. (*Boos v. Barry, supra*, 485 U.S. 312, 334 (conc. opn. of Brennan, J.).)

The Mall asserts that our decision in *Alliance, supra,* 22 Cal.4th 352, supports its position that its rule is not content based, but the Mall's reliance is misplaced. In that case, we held that "an ordinance . . . that is directed at activity involving public solicitation for the immediate donation or payment of funds should not be considered content based . . . and should be evaluated under the intermediate scrutiny standard applicable to time, place, and manner regulations, rather than under the strict scrutiny standard." (*Id.* at p. 357.) The ordinance at issue in *Alliance* made it unlawful to solicit or beg " 'with the purpose of obtaining an immediate donation of money or other thing of value' " in certain areas, such as near a bank or automated teller machine, or in any public place if the solicitation was done in an " 'aggressive manner.' " (*Id.* at p. 363, italics omitted.)

The Mall argues that "boycotts can be prohibited for the same reason that the solicitation of funds can be prohibited," but this argument does not withstand analysis. In holding that the ordinance in *Alliance* banning solicitation for immediate donation or exchange of funds was content neutral, we explained that the United States Supreme Court used the rule "that a restriction is content neutral if it is 'justified without reference to the content of the regulated speech.' [Citations.]" (*Alliance, supra,* 22 Cal.4th 352, 367.) This rule does "*not* require literal or absolute content neutrality, but instead require[s] only that the regulation be 'justified' by legitimate concerns that are unrelated to any 'disagreement with the message' conveyed by the speech. [Citation.]" (*Id.* at p. 368.) We then focused on the manner in which a face-to-face solicitation asking for an immediate donation is conducted. By its very nature, this type of solicitation "may create distinct problems and risks that warrant different treatment and regulation" than other forms of speech-related activity. (*Id.* at p. 357.) Such a solicitation was " 'disruptive of business' " because it " 'impedes the normal flow of traffic.' " (*Id.* at p. 369, quoting *United States v. Kokinda* (1990) 497 U.S. 720, 733–734 [111 L.Ed.2d 571, 110 S.Ct. 3115].) Additionally, " '[i]n-person solicitation of funds, when combined with immediate receipt of that money, creates a risk of fraud and duress . . . .' " (*Alliance,* at p. 371, quoting *International Soc. for Krishna Consciousness, Inc. v. Lee* (1992) 505 U.S. 672, 705 [120 L.Ed.2d 541, 112 S.Ct. 2701] (conc. opn. of Kennedy, J.).) The ordinance in *Alliance* was directed at the conduct and intrusiveness that face-to-face solicitation for immediate donation or exchange of funds inherently promotes. We therefore found the ban on certain solicitations to be content neutral because it was justified by legitimate concerns that were unrelated to content.

The rule at issue here prohibiting speech that advocates a boycott cannot similarly be justified by legitimate concerns that are unrelated to content. Peacefully urging a boycott in a mall does not by its nature cause congestion, nor does it promote fraud or duress. "[T]he boycott is a form of speech or conduct that is ordinarily entitled to protection under the First and

Fourteenth Amendments." (*NAACP v. Claiborne Hardware Co.* (1982) 458 U.S. 886, 907 [73 L.Ed.2d 1215, 102 S.Ct. 3409], fn. omitted.) Our California Constitution provides greater, not lesser, protection for this traditional form of free speech. (See *Gerawan Farming, Inc. v. Lyons, supra,* 24 Cal.4th 468, 491.) Unlike the ordinance in *Alliance,* the Mall's rule in the instant case is not concerned with the inherently intrusive nature of such speech, but rather with the impact such speech may have on its listeners. "Handbills . . . 'depend entirely on the persuasive force of the idea.' [Citation.]" (*DeBartolo Corp. v. Fla. Gulf Coast Trades Council* (1988) 485 U.S. 568, 580 [99 L.Ed.2d 645, 108 S.Ct. 1392].) "The loss of customers because they read a handbill urging them not to patronize a business . . . is the result of mere persuasion . . . ." (*Ibid.*) The Mall is concerned that the speech may be effective and persuade customers not to patronize a store. But "[l]isteners' reaction to speech is not a content-neutral basis for regulation." (*Forsyth County v. Nationalist Movement* (1992) 505 U.S. 123, 134 [120 L.Ed.2d 101, 112 S.Ct. 2395] [basing the amount of a permit fee on the degree of hostility the message would create is a content-based regulation of speech].) The Mall seeks to prohibit speech advocating a boycott solely because it disagrees with the message of such speech, which might persuade some potential customers not to patronize the stores in the Mall.

The Mall relies heavily on a Court of Appeal decision that also involved a solicitation of funds and predates our decision in *Alliance. H-CHH Associates v. Citizens for Representative Government* (1987) 193 Cal.App.3d 1193, 1203 [238 Cal.Rptr. 841] (*H-CHH*), held that a shopping mall properly could prohibit the solicitation of " 'contributions or donations from anyone on center property.' " Citing as authority only a decision of the Third Circuit Court of Appeals (*Intern. Soc. for Krishna v. New Jersey Sports, etc.* (3d Cir. 1982) 691 F.2d 155), the Court of Appeal in *H-CHH* concluded that "the solicitation of political funds is entirely incompatible with the normal character and function of the Plaza. The Plaza exists as a center of commerce . . . . Any activity seeking to solicit political contributions necessarily interferes with that function by competing with the merchant tenants for the funds of Plaza patrons." (*H-CHH, supra,* 193 Cal.App.3d at p. 1221.)

Although as noted above, solicitations for immediate donations may be restricted based upon "the inherently intrusive and potentially coercive nature of that *kind* of speech" (*Alliance, supra,* 22 Cal.4th 352, 373), the decision in *H-CHH* was incorrect that solicitations of funds may be prohibited simply because they compete with the shopping center's merchants. Relying upon the fact that a solicitation of funds competes with the shopping center merchants, as did the court in *H-CHH* and as does the Mall in this case, would lead to the conclusion that all solicitations of funds may be

prohibited, even those that are not inherently intrusive or potentially coercive. Such a restriction would be too broad.[12]

We conclude, therefore, that the Mall's rule prohibiting all speech that advocates a boycott is content based and thus is subject to strict scrutiny. (*Alliance, supra*, 22 Cal.4th 352, 365.) Strict scrutiny for purposes of the federal Constitution means that a content-based speech restriction must be "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." (*Arkansas Writers' Project, Inc. v. Ragland* (1987) 481 U.S. 221, 231 [95 L.Ed.2d 209, 107 S.Ct. 1722].) The right to free speech in shopping centers that constitute public fora under the California Constitution deserves no less protection. In order to ensure that regulations of speech are not " 'based on—hostility or favoritism—towards the underlying message expressed' " (*Turner Broadcasting System, Inc. v. FCC* (1994) 512 U.S. 622, 642 [129 L.Ed.2d 497, 114 S.Ct. 2445]), a content-based rule limiting expression in a shopping center that constitutes a public forum must be necessary to serve a compelling interest and be narrowly drawn to achieve that end.

The Mall's rule prohibiting speech that advocates a boycott cannot withstand strict scrutiny. The Mall's purpose to maximize the profits of its merchants is not compelling compared to the Union's right to free expression. Urging customers to boycott a store lies at the core of the right to free speech. (*NAACP v. Claiborne Hardware Co., supra*, 458 U.S. 886, 911 ["boycott clearly involved constitutionally protected activity"].) "The safeguarding of these rights to the ends that men may speak as they think on matters vital to them and that falsehoods may be exposed through the processes of education and discussion is essential to free government. Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political and economic truth." (*Thornhill v. Alabama, supra*, 310 U.S. 88, 95.) The fact that speech may be convincing is not a proper basis for prohibiting it. The right to free speech "extends to more than abstract discussion, unrelated to action. The First Amendment is a charter for government, not for an institution of learning. 'Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts. [Citations.]" (*Thomas v. Collins* (1945) 323 U.S. 516, 537 [89 L.Ed. 430, 65 S.Ct. 315].) The Mall cites no authority, and we are aware of none, that holds that a store has a compelling interest in prohibiting this traditional form of free speech.

A shopping mall is a public forum in which persons may reasonably exercise their right to free speech guaranteed by article I, section 2 of the

---

[12] We disapprove the decision in *H-CHH Associates v. Citizens for Representative Government, supra*, 193 Cal.App.3d 1193, to the extent it states a contrary view.

California Constitution. Shopping malls may enact and enforce reasonable regulations of the time, place and manner of such free expression to assure that these activities do not interfere with the normal business operations of the mall, but they may not prohibit certain types of speech based upon its content, such as prohibiting speech that urges a boycott of one or more of the stores in the mall.

## CONCLUSION

■ We hold that, under California law, Fashion Valley Mall may not maintain and enforce against the Union its rule 5.6.2, which prohibits "[u]rging, or encouraging in any manner, customers not to purchase the merchandise or services offered by any one or more of the stores or merchants in the shopping center."

George, C. J., Kennard, J., and Werdegar, J., concurred.

**CHIN, J.,** Dissenting.—I dissent.

By a bare four-to-three majority, *Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341] (*Pruneyard*)[1] overruled a decision then only five years old and held that public free speech rights exist on private property under the California Constitution. *Pruneyard* was wrong when decided. In the nearly three decades that have since elapsed, jurisdictions throughout the nation have overwhelmingly rejected it. We should no longer ignore this tide of history. The time has come for us to forthrightly overrule *Pruneyard* and rejoin the rest of the nation in this important area of the law. Private property should be treated as private property, not as a public free speech zone.

Even if we do not overrule *Pruneyard, supra*, 23 Cal.3d 899, we should at least not carry it to the extreme that the majority does. *Pruneyard* is easily distinguished. The free speech activity that *Pruneyard* sanctioned was compatible with normal use of the property. The opposite is true here. Fashion Valley Mall is a privately owned shopping center. A shopping center exists for the individual businesses on the premises to do business. Urging a boycott of those businesses contradicts the very purpose of the shopping center's existence. It is wrong to compel a private property owner to allow an activity that contravenes the property's purpose.

---

[1] Courts have not been consistent in giving this case a shorthand name. For example, the plurality, concurring, and dissenting opinions in *Golden Gateway Center v. Golden Gateway Tenants Assn.* (2001) 26 Cal.4th 1013 [111 Cal.Rptr.2d 336, 29 P.3d 797] (*Golden Gateway*) called it *Robins* for short. But because the majority here calls it *Pruneyard*, I will do so also.

## I. THE FACTS

Fashion Valley Mall, LLC (Fashion Valley), owns a large shopping mall in San Diego (the mall). Fashion Valley permits expressive activities inside the mall by those who apply for a permit and agree to abide by its regulations. An applicant for a permit must state the purpose of the proposed expressive activity, submit a copy or a description of any materials and signs to be used, list the participants, provide a $50 refundable cleaning deposit, and purchase insurance as necessary. Additionally, pursuant to Fashion Valley's rule 5.6.2 (rule 5.6.2), the applicant must agree to abstain from "Urging, or encouraging in any manner, customers not to purchase the merchandise or services offered by any one or more of the stores or merchants in the shopping center."

In October 1998, approximately 30 members and supporters of the Graphic Communications International Union, Local 432-M (Union) gathered outside the Robinsons-May department store at the mall to protest actions taken by The San Diego Union-Tribune newspaper. The Union decided to stage the protest there because the store advertises in the newspaper and is located not far from the newspaper's premises. The protestors distributed a handbill addressed, "Dear customer of Robinsons-May," that outlined the Union's grievances against the newspaper. The handbill made clear "[t]o the employees of Robinsons-May . . . [the] dispute is with The San Diego Union-Tribune. We are not asking you to cease working for your employer." The Union encouraged patrons and employees to call the newspaper's chief executive officer. The handbill stated that "Robinsons-May advertises with the Union-Tribune." After about 15 minutes, a representative of Fashion Valley approached the protestors, explained that a permit was required for expressive activity, and told them to leave the premises, which they did.

Later, instead of applying for a permit, the Union filed a charge with the National Labor Relations Board (Board) alleging that Fashion Valley had violated section 8(a)(1) of the National Labor Relations Act (29 U.S.C. § 158(a)(1)), which makes it an unfair labor practice to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7" of the act. That section guarantees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." (29 U.S.C. § 157.) An administrative law judge, and later the Board, held that Fashion Valley did violate section 8(a)(1). The Board ordered Fashion Valley to rescind rule 5.6.2.

Fashion Valley petitioned the District of Columbia Circuit to review the Board's decision. The court "h[e]ld that whether Fashion Valley violated the

[National Labor Relations Act] depends upon whether it had the right, under California law, to maintain and enforce its anti-boycott rule." (*Fashion Valley Mall, LLC. v. N.L.R.B.* (D.C.Cir. 2006) 371 U.S. App.D.C. 322 [451 F.3d 241, 242] (*Fashion Valley*).) Pursuant to California Rules of Court, former rule 29.8 (now rule 8.548), it requested us to answer the following question: "Under California law may Fashion Valley maintain and enforce against the Union its Rule 5.6.2?" (*Fashion Valley, supra,* at p. 246.) We granted the request. Later, we permitted the Union to intervene in the action. (Code Civ. Proc., § 387, subd. (a).)

## II. DISCUSSION

The issue here is straightforward: Does the California Constitution compel the owner of a private shopping center to allow persons on its property to urge potential customers to boycott businesses within the center? Saying yes, the majority relies primarily on *Pruneyard, supra,* 23 Cal.3d 899. To place this issue in perspective, I first provide a historical review. Then I will explain why we should overrule *Pruneyard.* Finally, I will show that *Pruneyard,* even if still considered the law in California, is entirely distinguishable.

### A. *Historical Review*

At one time, both this court and the United States Supreme Court held that, in some situations, constitutional free speech rights existed on private property. (E.g., *Food Employees v. Logan Plaza* (1968) 391 U.S. 308 [20 L.Ed.2d 603, 88 S.Ct. 1601] (*Logan*) [private shopping center]; *Marsh v. Alabama* (1946) 326 U.S. 501 [90 L.Ed. 265, 66 S.Ct. 276] (*Marsh*) [company town]; *Diamond v. Bland* (1970) 3 Cal.3d 653 [91 Cal.Rptr. 501, 477 P.2d 733] (*Diamond I*) [private shopping center]; *In re Lane* (1969) 71 Cal.2d 872 [79 Cal.Rptr. 729, 457 P.2d 561] (*Lane*) [stand-alone grocery store]; *Schwartz-Torrance Investment Corp. v. Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766 [40 Cal.Rptr. 233, 394 P.2d 921] (*Schwartz-Torrance*) [private shopping center].) Because both the United States and the California Constitutions seemed to be the same in this regard, this court did not clearly establish which Constitution it relied on in finding free speech rights. We treated the two Constitutions as essentially interchangeable. For example, our opinion in *Schwartz-Torrance, supra,* at pages 771–773, relied in part on *Marsh,* as well as cases from other states, and our opinions in *Lane, supra,* at pages 874–877, and *Diamond I, supra,* at pages 658–660, relied heavily on *Marsh* and *Logan.* As of 1970, our jurisprudence was consistent with high court jurisprudence in this area.

All this changed in the decade of the 1970's regarding private shopping centers. In two decisions, the United States Supreme Court reversed *Logan,*

*supra*, 391 U.S. 308, and held that no free speech rights exist in private shopping centers under the United States Constitution. (*Hudgens v. NLRB* (1976) 424 U.S. 507 [47 L.Ed.2d 196, 96 S.Ct. 1029] (*Hudgens*); *Lloyd Corp. v. Tanner* (1972) 407 U.S. 551 [33 L.Ed.2d 131, 92 S.Ct. 2219] (*Lloyd Corp.*).) As we recently explained, the *Hudgens* court "held that a union had no federal constitutional right to picket in a shopping center because the actions of the private owner of the shopping center did not constitute state action." (*Golden Gateway, supra*, 26 Cal.4th at p. 1019 (plur. opn. of Brown, J.).)

The question whether the new high court decisions affected California law arose promptly. Even before the second of these decisions, we reconsidered our decision in *Diamond I, supra*, 3 Cal.3d 653, in a second case of the same name. In *Diamond v. Bland* (1974) 11 Cal.3d 331 [113 Cal.Rptr. 468, 521 P.2d 460] (*Diamond II*), we followed the high court and held that "defendants' private property interests outweigh plaintiffs' own interests in exercising First Amendment rights in the manner sought herein." (*Id.* at p. 335.) We noted that "[o]ur prior holding in [*Diamond I*] was based primarily upon our interpretation of the rationale of two cases of the United States Supreme Court, namely, *Marsh v. Alabama*, 326 U.S. 501 [90 L.Ed. 265, 66 S.Ct. 276], and *Food Employees v. Logan Plaza*, 391 U.S. 308 [20 L.Ed.2d 603, 88 S.Ct. 1601]." (*Id.* at pp. 333–334.) *Diamond II* was decided by a vote of four to three. Justice Burke authored the majority opinion and was joined by Chief Justice Wright and Justices McComb and Clark. Justice Mosk, the author of *Diamond I*, dissented in *Diamond II* and was joined by Justice Tobriner and, in part, Justice Sullivan. Justice Mosk would have reaffirmed the holding of *Diamond I* but grounded it solely on California constitutional law.

Our adherence to high court jurisprudence in this area did not last long. Shortly after our 1974 decision in *Diamond II, supra*, 11 Cal.3d 331, the composition of this court changed. This change led, in 1979, to another four-to-three decision. In *Pruneyard, supra*, 23 Cal.3d 899, we overruled *Diamond II, supra*, 11 Cal.3d 331, and effectively reinstated *Diamond I, supra*, 3 Cal.3d 653. The majority opinion, authored by Justice Newman and joined by Chief Justice Bird and Justices Tobriner and Mosk, relied heavily on Justice Mosk's dissenting opinion in *Diamond II*. It noted that the California Constitution uses different language than does the United States Constitution in guaranteeing free speech rights. California Constitution, article I, section 2, subdivision (a) provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." The First Amendment to the United States Constitution more concisely protects "the freedom of speech."

*Pruneyard* held "that the soliciting at a shopping center of signatures for a petition to the government is an activity protected by the California Constitution." (*Pruneyard, supra*, 23 Cal.3d at p. 902.) More generally, it stated that the California Constitution "protect[s] speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." (*Id.* at p. 910.) Justice Richardson, joined by Justices Clark and Manuel dissented. (*Id.* at pp. 911–916.) The United States Supreme Court later affirmed *Pruneyard* (*sub nom. Pruneyard Shopping Center v. Robins* (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035]), but only to the extent of holding that federal law did not prevent California from providing greater speech rights on private shopping centers than the federal Constitution provides.

As I show in the next section, history has not been kind to the majority opinion in *Pruneyard*.

B. Pruneyard *Revisited*

*Pruneyard, supra*, 23 Cal.3d 899, was controversial when decided. In the three decades since then, it has received scant support and overwhelming rejection around the country. As the 2001 plurality opinion in *Golden Gateway* noted, "most of our sister courts interpreting state constitutional provisions similar in wording to California's free speech provision have declined to follow [*Pruneyard*]. [Fn. omitted.] Indeed, some of these courts have been less than kind in their criticism of [*Pruneyard*]." (*Golden Gateway, supra*, 26 Cal.4th at pp. 1020–1021.)[2] The opinion fully supported these statements with citations to decisions from the many jurisdictions that have considered but rejected *Pruneyard*, and the few that have followed its lead to a limited extent. I need not repeat those citations. (*Golden Gateway, supra*, 26 Cal.4th at pp. 1021–1022, fn. 5.)

As of the time we decided *Golden Gateway*, the following states, many with constitutional free speech language essentially identical to California's, had rejected any form of a *Pruneyard* approach regarding shopping centers and free speech rights: Arizona, Connecticut, Georgia, Michigan, Minnesota,

---

[2] For example, the New York Court of Appeal, in an opinion that found no right to free speech in a privately owned shopping center under a state constitutional free speech provision that is essentially identical to California's, described this court's "4–3 decision" in *Pruneyard* as "hardly persuasive authority. That court, in overruling its own contrary precedent only five years old [citing *Diamond II, supra*, 11 Cal.3d 331], simply said that the California Constitution protected speech and petitioning at private shopping centers. There is not much analysis and only tangential discussion, if it can be called that, of the State action question. It is evident that the result in [*Pruneyard*] was dictated by 'the accident of a change of personalities in the Judges of [the] court' . . . ." (*SHAD v. Smith Haven Mall* (1985) 66 N.Y.2d 496 [498 N.Y.S.2d 99, 488 N.E.2d 1211, 1215, fn. 5].)

New York, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, and Wisconsin. (See *Golden Gateway, supra*, 26 Cal.4th at pp. 1020–1021 & fn. 5; *United Food & Commercial Workers Union, Local 919, AFL-CIO v. Crystal Mall Associates, L.P.* (Conn. 2004) 852 A.2d 659, 667–668 (*United Food*); Annot., Validity, Under State Constitutions, of Private Shopping Center's Prohibition or Regulation of Political, Social, or Religious Expression or Activity (1997) 52 A.L.R.5th 195.) Nevertheless, the *Golden Gateway* court followed *Pruneyard* as the law of California. The plurality, which I joined, did so reluctantly, and only due to principles of stare decisis. (*Golden Gateway, supra*, 26 Cal.4th at p. 1022.)

In the six years since we decided *Golden Gateway, supra*, 26 Cal.4th 1013, we have become yet more isolated. No new state has followed our lead. Two more states have refused to follow the *Pruneyard* approach: Hawaii and Iowa. (*State v. Viglielmo* (2004) 105 Haw. 197 [95 P.3d 952]; *City of West Des Moines v. Engler* (Iowa 2002) 641 N.W.2d 803.) Moreover, as I explain, the few states that previously adopted an approach like *Pruneyard* are generally retreating.[3]

I need not review all of the cases because three years ago the Connecticut Supreme Court did so. (*United Food, supra*, 852 A.2d 659, 667–668.) In *United Food*, the court unanimously refused to reconsider its earlier decision of *Cologne v. Westfarms Associates* (1984) 192 Conn. 48 [469 A.2d 1201] (*Cologne*), which had rejected *Pruneyard* even though Connecticut's constitutional free speech provisions are essentially identical to California's. (*United Food, supra*, 852 A.2d 659.)[4] It explained that "[s]ince the decision in *Cologne*, courts in other jurisdictions that have considered this issue overwhelmingly have chosen *not* to interpret their state constitutions as requiring private property owners, such as those who own large shopping malls, to permit certain types of speech, even political speech, on their premises." (*United Food*, at p. 667.) It summarized the law that most of the country has adopted: "Under *Cologne*, as in the overwhelming majority of our sister jurisdictions, the size of the mall, the number of patrons it serves, and the fact that the general public is invited to enter the mall free of charge do not, even

---

[3] Additionally, the Supreme Courts of Illinois, Nebraska, and Nevada have cited but declined to follow the *Pruneyard* approach in various free speech contexts. (*People v. DiGuida* (1992) 152 Ill.2d 104 [178 Ill.Dec. 80, 604 N.E.2d 336, 340, 342–347]; *Dossett v. First State Bank* (2001) 261 Neb. 959 [627 N.W.2d 131, 138–139]; *S.O.C., Inc. v. The Mirage Casino-Hotel* (2001) 117 Nev. 403 [23 P.3d 243, 250].)

[4] Article I, section 4, of the Connecticut Constitution provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Article I, section 5, of that constitution provides: "No law shall ever be passed to curtail or restrain the liberty of speech . . . ." (See *United Food, supra*, 852 A.2d at p. 660, fns. 3, 4.)

when considered together, advance the plaintiff's cause in converting private action into government action." (*Id.* at p. 673.)

As explained in *United Food, supra*, 852 A.2d at pages 668–670, only four other states (Colorado, Massachusetts, New Jersey, and Washington) retain any form of independent state grounds in this area. Washington has very narrowly confined its original independent state ground decision. (*Southcenter Joint Venture v. NDPC* (1989) 113 Wn.2d 413 [780 P.2d 1282]; see the discussions in *Golden Gateway, supra*, 26 Cal.4th at p. 1021, fn. 5; *United Food, supra*, 852 A.2d at pp. 668, 669 & fns. 13, 16; and *State v. Viglielmo, supra*, 95 P.3d at pp. 964–965.) Regarding Massachusetts, the Connecticut Supreme Court explained, " 'The Massachusetts decision was expressly limited to the solicitation of signatures needed by political candidates for access to the ballot and relied, not upon its freedom of speech provision, but upon a state constitutional guarant[ee] of an equal right to elect officers and to be elected, for public employments. [Citation.]' " (*United Food, supra*, 852 A.2d at p. 669, quoting the court's earlier decision in *Cologne, supra*, 469 A.2d 1201.) Colorado recently permitted a shopping center to adopt substantial restraints on the exercise of free speech on its property despite its earlier *Pruneyard*-like stance. (*Robertson v. Westminster Mall Co.* (Colo.Ct.App. 2001) 43 P.3d 622.) That leaves New Jersey; and even that state has not, to my knowledge, carried its jurisprudence to the extreme to which the majority is leading California.

The time has come to recognize that we are virtually alone, and that *Pruneyard* was ill conceived. Oregon originally had its own version of *Pruneyard*, albeit one based on a different constitutional provision. (*Lloyd Corporation v. Whiffen* (1993) 315 Ore. 500 [849 P.2d 446].) That decision, also by a four-to-three vote, relied in part on "the decision by the California Supreme Court in [*Pruneyard*] . . . ." (*Id.* at p. 454.) Later the Oregon Supreme Court concluded that *Lloyd Corporation v. Whiffen, supra*, 849 P.2d 446, was erroneous and "disavowed" it. (*Stranahan v. Fred Meyer, Inc.* (2000) 331 Ore. 38 [11 P.3d 228, 243]; see *Golden Gateway, supra*, 26 Cal.4th at p. 1021, fn. 5.) It also refused to find free speech rights on private property under the Oregon Constitution's free speech provision, which, like Connecticut's, is essentially identical to California's. (*Stranahan v. Fred Meyer, Inc., supra*, at pp. 243–244, fn. 19.)[5] We should do what Oregon did and disavow *Pruneyard*.

In *Lloyd Corp.*, the high court distinguished its earlier decision of *Marsh, supra*, 326 U.S. 501, which involved a company town. It explained that

---

[5] Article I, section 8, of the Oregon Constitution provides: "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever, but every person shall be responsible for the abuse of this right." (See *Stranahan v. Fred Meyer, Inc., supra*, 11 P.3d at p. 231, fn. 3.)

*Marsh* "involved the assumption by a private enterprise of all of the attributes of a state-created municipality and the exercise by that enterprise of semi-official municipal functions as a delegate of the State. In effect, the owner of the company town was performing the full spectrum of municipal powers and stood in the shoes of the State." (*Lloyd Corp., supra*, 407 U.S. at p. 569, fn. omitted.) But a shopping center is different from a company town. "[P]roperty [does not] lose its private character merely because the public is generally invited to use it for designated purposes. Few would argue that a free-standing store, with abutting parking space for customers, assumes significant public attributes merely because the public is invited to shop there. Nor is size alone the controlling factor. The essentially private character of a store and its privately owned abutting property does not change by virtue of being large or clustered with other stores in a modern shopping center." (*Ibid.*) I, along with the many jurisdictions that have followed the high court, agree.

As the plurality opinion in *Golden Gateway* explained, principles of stare decisis should make us cautious before we overrule a previous case. There should be a special justification for doing so. (*Golden Gateway, supra*, 26 Cal.4th at p. 1022.) But we do sometimes overrule our prior decisions, and appropriately so. In this case it would be entirely proper to do so, especially in light of our increasing isolation in the six years since *Golden Gateway* was decided. The *Pruneyard* court itself ignored stare decisis. It overruled a decision of this court that was only five years old at the time. Why should a decision that overruled a recent decision, and that identified nothing that occurred in the intervening years to justify the action, be sheltered from reconsideration? In essence, there were two four-to-three decisions in the 1970's that reached opposite results. Indeed, of the 11 justices who participated in *Diamond II, supra*, 11 Cal.3d 331, or *Pruneyard, supra*, 23 Cal.3d 899, or both, a majority of six followed or would have followed the high court (Chief Justice Wright and Justices McComb, Burke, Clark, Richardson, and Manuel), and only five urged or joined what would become the *Pruneyard* approach (Chief Justice Bird, and Justices Tobriner, Mosk, Sullivan, and Newman). I would join the majority of six, as have most of the jurisdictions that have considered the question.

Moreover, the *Pruneyard* court made no effort to find anything in the text of article I, section 2, subdivision (a) of the California Constitution, its historical sources, or the process that led to its adoption, that suggests any intent to extend its terms to private property. Instead, as the Wisconsin Supreme Court observed in a case that rejected *Pruneyard* even though Wisconsin's constitutional free speech provision is essentially identical to California's, "the majority [in *Pruneyard*] did not analyze the constitutional

sections, but rather summarily stated the protections granted by those sections. It appears to be more a decision of desire rather than analytical conviction." (*Jacobs v. Major* (1987) 139 Wis.2d 492 [407 N.W.2d 832, 841].)[6]

I do not denigrate free speech rights. As the New York Court of Appeal stated in its opinion rejecting *Pruneyard*, "the right to free expression is one of this Nation's most cherished civil liberties." (*SHAD v. Smith Haven Mall, supra*, 488 N.E.2d at p. 1212; see also *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 970–977 [119 Cal.Rptr.2d 296, 45 P.3d 243] (dis. opn. of Chin, J.).) But free speech rights and private property rights can and should coexist. The last 30 years have not seen a significant diminution of free speech opportunities in the many jurisdictions that have followed the high court's lead regarding private property. The Union here is not without recourse if it wants to urge a lawful boycott of any business or engage in any other protected freedom of expression. It has plenty of outlets to exercise its free speech rights. If it wants to picket, it simply has to do so on public property or seek permission from private property owners. The Union can exercise its free speech rights, for example, just outside the shopping center, including near the entrances. Additionally, and especially today with the advent of the Internet and other forms of mass communication, "other public forums [are available] for the distribution and dissemination of . . . ideas." (*Diamond II, supra*, 11 Cal.3d at p. 334.) But I would find no right to engage in speech activity on private property over the owner's objection.

## C. Pruneyard *Distinguished*

Even if we stubbornly maintain our position of "magnificent isolation"[7] in the face of this tide of history, we should not carry *Pruneyard* to the extreme of forbidding private property owners from controlling expressive activity on their property—urging a boycott of its tenants—that is *inimical* to the purpose for which the property is being used. *Pruneyard* is readily distinguishable.

Assuming free speech rights exist in shopping centers, the fact remains that they are not Hyde Park in London, Central Park in New York, or the National Mall in Washington, D.C., areas that are quintessential public free speech

---

[6] Article I, section 3, of the Wisconsin Constitution provides: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press." (See *Jacobs v. Major, supra*, 407 N.W.2d at p. 833, fn. 1.)

[7] The court in *Andersen v. United States* (9th Cir. 1956) 237 F.2d 118, 127, so described the position of the two jurisdictions that adopted or followed the infamous "product rule" for insanity stated in *Durham v. United States* (D.C.Cir. 1954) 94 U.S. App.D.C. 228 [214 F.2d 862].

zones. Shopping centers are private property dedicated to doing business. Their owners should not have to permit all expressive activity that the California and United States Constitutions protect in public places. A shopping center owner should be allowed to enforce reasonable restrictions to protect its business activities even if the government could not impose similar restrictions. Rule 5.6.2 is such a restriction.

In *Pruneyard*, the activity the majority compelled a shopping center owner to permit on its property was the soliciting of signatures for a petition to the government. (*Pruneyard, supra*, 23 Cal.3d at p. 902.) Likewise, in *Diamond I*, the activity was "securing signatures on two anti-pollution initiative petitions." (*Diamond I, supra*, 3 Cal.3d at p. 655.) Soliciting petition signatures, and much other free speech activity, although perhaps not furthering the shopping center's business, is fully compatible with that business. The same is not true here. The purpose of a shopping center is to provide a place where the tenants, i.e., the individual businesses, may do business. Urging a boycott of a tenant's business is antithetical to that purpose. We should not compel shopping center owners to permit activity that interferes with the purpose for the center's existence.

*Pruneyard*'s own analysis permits this conclusion. "By no means do we imply that those who wish to disseminate ideas have free rein. . . . [A]s Justice Mosk stated in *Diamond II*, '. . . A handful of additional orderly persons soliciting signatures and distributing handbills in connection [with the shopping center], under reasonable regulations adopted by defendant to assure that these activities do not interfere *with normal business operations* (see *Diamond [I]* at p. 665) *would not markedly dilute defendant's property rights*.' (11 Cal.3d at p. 345 (dis. opn. of Mosk, J.).)" (*Pruneyard, supra*, 23 Cal.3d at pp. 910–911, italics added.)

*Diamond I* was also limited in its reach. We stressed that "[i]t bears repeating that no evidence was presented to the trial court that plaintiffs' activities actually interfered with the normal business operations of the [shopping center]. Plaintiffs do not contend that they are entitled to use private property for the dissemination of ideas without limitations *imposed by reasonable regulations designed to protect the business activities* of the Center. . . . [¶] We impose no unrealistic burden on the operators of shopping centers in insisting that their control over First Amendment rights [obviously, now limited to free speech rights under the California Constitution] be exercised, if at all, through *reasonable regulations calculated to protect their business interests* rather than through absolute bans on all nonbusiness-related activities. Shopping centers . . . are not incapable of regulating permissible activities." (*Diamond I, supra*, 3 Cal.3d at p. 665, fn. omitted, italics added.)

A reasonable interpretation of these decisions, and one that would at least nudge this court toward the judicial mainstream, is that shopping center owners may impose reasonable regulations to protect their business interests, and that rule 5.6.2 is such a reasonable regulation. Compelling property owners to permit use of their property that would hinder business success *would* markedly dilute their property rights. Fashion Valley should at least be able to protect its business interests by enforcing rule 5.6.2.

It is true that two old cases that predate *Hudgens, supra*, 424 U.S. 507, *Lloyd Corp., supra*, 407 U.S. 551, and *Diamond II, supra*, 11 Cal.3d 331, involved boycotts. (*Lane, supra*, 71 Cal.2d 872; *Schwartz-Torrance, supra*, 61 Cal.2d 766.) It is also true that the majority opinion in *Pruneyard* cited those cases with approval. (*Pruneyard, supra*, 23 Cal.3d at pp. 908–909.) But the fact remains that they were based in large part on federal law that has since been discredited, and the belief that federal and state constitutional law coincided in this area. *Pruneyard* should at least be interpreted on its facts and its holding. It cannot somehow have revalidated old cases that had different facts and were decided under a legal landscape that is now obsolete.

*Lane* involved "an individual grocery store." (*Lane, supra*, 71 Cal.2d at p. 873.) But recent Court of Appeal decisions have definitively held that *Pruneyard* does *not* extend to stand-alone stores like the one in *Lane*. (*Albertson's, Inc. v. Young* (2003) 107 Cal.App.4th 106 [131 Cal.Rptr.2d 721] [grocery store]; *Trader Joe's Co. v. Progressive Campaigns, Inc.* (1999) 73 Cal.App.4th 425 [86 Cal.Rptr.2d 442] [retail store]; see also *Waremart Foods v. N.L.R.B.* (D.C. Cir. 2004) 359 U.S. App.D.C. 312 [354 F.3d 870] [grocery store].) These cases found *Pruneyard*'s citation of *Lane* and *Schwartz-Torrance* not dispositive. As the *Alberston's, Inc.* court noted in refusing to follow *Lane*, "we are not aware of any legal principle by which a court, years after rendering a decision, can retroactively alter its ratio decidendi." (*Albertson's, Inc., supra*, at p. 123; see also *Trader Joe's Co., supra*, at p. 436 [*Pruneyard*'s reference "to *Lane* was brief and collateral"].)

Today's majority opinion carefully says nothing casting doubt on the recent cases involving stand-alone stores, and they are surely correct. But if the older cases cited in *Pruneyard* are no longer authoritative in *that* respect, why should they be any more authoritative in *this* respect? In fact, they are no longer authoritative at all. If we are to preserve *Pruneyard*, we should at least interpret it on its own, and not be bound by ancient cases based on law that has long since disappeared.

The majority is also inconsistent in its treatment of First Amendment law. It rejects First Amendment law entirely as it relates to private property—law that is directly on point here—but then it relies heavily on First Amendment

cases that involve restrictions the *government* has placed on speech. (Maj. opn., *ante*, at pp. 866–869.) It cites the federal strict scrutiny test that applies to *governmental* restrictions and that requires the government to show the restriction serves a compelling *state* interest. (*Id.* at p. 869.) It relies on, and quotes selectively from, *Turner Broadcasting System, Inc. v. FCC* (1994) 512 U.S. 622, 642 [129 L.Ed.2d 497, 114 S.Ct. 2445], which says, " 'The *government* may not regulate [speech] based on hostility—or favoritism—towards the underlying message expressed.' " (Italics added; see maj. opn., *ante*, at p. 869.) It then asserts, with no apparent awareness of the distinction—vital under the First Amendment—between governmental action and actions by private property owners, that the same rules apply here. (Maj. opn., *ante*, at p. 869.)

The strict scrutiny test that applies to the government has no application to action by private landowners involving their own property. Even if it did, it would have to be adapted to recognize the fact that no governmental action is involved. The compelling *state* interest test would have to yield to some kind of "compelling landowner interest" test. A property owner can assert its own interests only, not the state's. If that test applied here, it would be met. Furthering business on its private property is not only a compelling interest, it is the property owner's primary concern; doing business is the reason the shopping center exists. In implementing rule 5.6.2, Fashion Valley is merely preventing persons from using its property to urge potential patrons not to do business with its tenants. The Union may urge a boycott if it wishes, just not on private property without permission.

In finding no compelling interest, the majority merely asserts that the right of persons to use property they do not own is more compelling than the landowner's right to use its own property for the very purpose it exists. (See maj. opn., *ante*, at p. 869.) I would instead give *some* priority to the property's owner. The bankruptcy of the majority's position is shown by its further assertion that "[t]he Mall cites no authority, and we are aware of none, that holds that a store has a compelling interest in prohibiting this traditional form of free speech." (Maj. opn., *ante*, at p. 869.) Good reason exists for this lack of authority. Because most of the country, including the United States Supreme Court, rejects the very notion of free speech rights on private property, *the issue never arises*. Only in California is the issue relevant. The only *tradition* that is relevant to this case is the tradition, followed in most of the country, of finding no free speech rights on private property. The majority is trampling on tradition, not following it.

I would find rule 5.6.2 valid even under *Pruneyard.*

### III. Conclusion

I would answer the certified question the District of Columbia Circuit posed as follows: Under California law, Fashion Valley may maintain and enforce against the Union its rule 5.6.2. Additionally, I would overrule *Pruneyard, supra*, 23 Cal.3d 899. The time has come for this court to join the judicial mainstream.

Accordingly, I dissent.

Baxter, J., and Corrigan, J., concurred.

Petitioner's petition for a rehearing was denied February 20, 2008. Baxter, J., Chin, J., and Corrigan, J., were of the opinion that the petition should be granted.